## NOVEMBER TERM, 1867.

THE RARITAN AND DELAWARE BAY RAILROAD CONPANY and THE CAMDEN AND ATLANTIC RAILROAD COMPANY, appellants, and THE DELAWARE AND RARITAN CANAL AND THE CAMDEN AND AMBOY RAILROAD AND TRANS-PORTATION COMPANIES, respondents.*

1. The several legislative acts giving to the Camden and Amboy Railroad and Transportation Company the exclusive franchise to carry passengers and goods between the cities of New York and Philadelphia, in part by means of a railroad across the state, examined, and *held* to be constitutional and valid, as a contract between the state and the company.

2. A state has the exclusive control over the construction and maintenance of railroads and other internal improvements within her own domain.

3. The right to build and use a railroad for the public use, is a franchise, the right to which can be derived from the sovereign only.

4. Such franchise, in its nature and·in the absence of express provision, is exclusive, except against the government; so that a competing road, established without legislative authority, will be enjoined.

5. As a consequence, *held* that the Raritan and Delaware Bay Railroad Company being wrong-doers in diverting their road from their charter route, and in acquiring a right of way to Camden by agreement with the Camden and Atlantic Railroad Company, will have no right, unless they shall acquire supplementary powers, to set up a competing line with the complainants, even after first of January, 1869, when what is called the monopoly privilege of the complainants comes to an end.

6. The injunction against the defendants continued and extended, and the decree of the Chancellor in other respects affirmed.

The opinion delivered in the Court of Chancery in this cause is reported in 1 *C. E. Green* 356.

The final decree in that court is as follows:

This cause coming on to be heard at the Term of October, 1863, before his Honor, Henry W. Green, Chancellor of the state of New Jersey, at Trenton, upon the pleadings and proof in said cause, and having been duly argued by the coun-

---

* CITED *in Erie R. Co.* v. *D., L. & W. R. Co.,* 6 *C. E. Gr.* 286; *Carlisle* v. *Cooper,* 6 *C. E. Gr.* 581; *Black* v. *Del. & R. Canal Co.,* 7 *C. E. Gr.* 402, 417; *Penn. R. Co.* v. *National R. Co.,* 8 *C. E. Gr.* 446; *Horse R. Co.* v. *Citizens Coach Co.,* 1 *Stew.* 147; *McGregor* v. *Erie R. Co.,* 6 *Vr.* 97; *N. J. Southern R. Co.* v. *Long Branch Comm'rs,* 10 *Vr.* 31.

sel of the said parties, and the Chancellor having taken time
to advise thereon until the Term of February, 1864, when
further time was taken to settle the form and terms of the
decree then pronounced, and now at this time, that is to say,
on the sixteenth day of May, 1865, the Chancellor is of
opinion, that by virtue of the acts of the legislature of the
state of New Jersey, bearing date the second day of March,
1832, and the sixteenth day of March, 1854, in the plead-
ings in this cause mentioned, and the acceptance thereof by
the complainants, the state of New Jersey entered into a
valid contract with the said complainants, which is now sub-
sisting and in force, to wit, that it should not be lawful be-
fore the first day of January, 1869, to construct any other
railroad or railroads in the state of New Jersey, without the
consent of the said complainants, which should be used for
the transportation of passengers or merchandise between the
cities of New York and Philadelphia, or to compete in busi-
ness between the said cities with the railroads of the com-
plainants, or that might in any manner be used or intended
to be used for the purpose of defeating the true intent of the
act of March the second, 1832, or the act approved March
sixteenth, 1854, in the pleadings in this cause mentioned,
that the intent of said contract was fully and effectually to
protect, until the first day of January, 1869, the business of
the said complainants from railroad competition, between
the cities of New York and Philadelphia; that the said busi-
ness to be protected from competition is the through
business from city to city, and not the transportation of
freight and passengers, to and from points and places within
the state of New Jersey along the line of the respective roads,
and between those points and the cities of New York and
Philadelphia respectively. And the Chancellor is further of
opinion, that the said contract and the said acts of the legis-
lature are not repugnant to, or in violation of, the constitu-
tion of the United States or of this state, or the rights and
privileges of the said Camden and Atlantic Railroad Com-
pany, or of the said Raritan and Delaware Bay Railroad

Company, as granted to them in and by their respective charters, or any acts supplementary thereto, and that the said defendants are bound to respect the said contract, and not to violate the same.

And the Chancellor is further of opinion that the incorporation of the Camden and Atlantic Railroad Company to construct a railroad across the state from Camden to the sea, at or near Absecom inlet, and the incorporation of the Raritan and Delaware Bay Railroad Company to construct a railroad from Raritan bay to Cape Island, were no violation on the part of the state of their contract with the complainants; that the junction of the Camden and Atlantic railroad with the Raritan and Delaware Bay railroad, at their necessary and legitimate point of intersection, so as to form a continuous, though circuitous line of railway from Camden to the Raritan bay, and which, with the aid of steamboats from the Delaware river and Raritan bay, will form a continuous line, and which, by possibility, may be used for the transportation of passengers and merchandise across the state between the cities of New York and Philadelphia, constituted no violation of the complainants' rights.

And it appearing to the satisfaction of the Chancellor, that arrangements have been entered into with direct reference to the formation of a continuous line of transportation between the cities of New York and Philadelphia, and that the transportation of freight and passengers from city to city is carried on over the defendants' roads by their co-operation and with their knowledge, and under and by virtue of agreements entered into between themselves and with others, and that the railroads of said defendants are used for the transportation of passengers and merchandise between the cities of New York and Philadelphia and are competing in business with the roads of the said complainants, in direct violation of the contract made by the state, and of the rights and privileges of the complainants, and that the complainants have in no wise acquiesced in such conduct of the defendants, nor consented thereunto; the Chancellor is further

of opinion, that the said acts on the part of the said defendants are a violation of the exclusive rights and privileges of the said complainants; and that the complainants are entitled to relief, and to the aid of this court, and the protection of such rights and privileges, and to an account of all such use of said railroads and branches and of such transportation, and to the damages they have sustained by such violation of their said exclusive franchise, and to the injunction prayed for in their supplemental bill, with their costs to be taxed.

Therefore, the Chancellor doth order, adjudge, and decree that the said defendants and their confederates, their and each of their officers, contractors, servants and agents, do absolutely desist and refrain from further transporting, or aiding or assisting in the transporting of passengers or merchandise from city to city, between the cities of New York and Philadelphia; and that the said defendants, the Raritan and Delaware Bay Railroad Company and the Camden and Atlantic Railroad Company and their confederates, contractors, and agents, desist and refrain from further permitting or allowing their respective railroads, engines, cars, or machinery, to be used for the purpose of carrying on such transportation of passengers or merchandise from city to city between the said cities, or for the purpose of aiding or assisting in the transportation of passengers or merchandise between the said cities from city to city; and that the said corporation defendants, their confederates, contractors, and agents, severally desist and refrain from forwarding, and from aiding or assisting to forward, and from permitting or allowing to be forwarded by way of the said railroads and branches, or any part thereof, from any point or place in this state, to any other point or place in this state, any passengers or merchandise which are or may be in the course of transportation from city to city between the said cities of New York and Philadelphia; and that all the said other defendants desist and refrain from aiding and abetting the said corporate defendants, or either of them, in any such forwarding passengers or freight; and that the defendants, and each of them, together with their confederates, con-

tractors, and agents, desist and refrain from doing any act or acts for or towards or in aid of the transportation of passengers, freight, or merchandise between New York and Philadelphia by way of said railroads, or either of them, or any part thereof, or said branches, either by using or permitting to be used the different sections thereof for that purpose in connection with each other, or by using the said railroads, or any part thereof, or said branches, in connection with any steamboat or steamboats; and that the said corporation defendants desist and refrain from permitting their respective roads, or any section or sections thereof, to be used for any such last mentioned purpose; and that said defendants respectively, and their confederates respectively, desist and refrain from performing, aiding, or contributing to the transportation of passengers or freight from city to city aforesaid across the said railroads, or any part thereof, and upon steamboats running in connection therewith, by any other device or contrivance whatsoever; and that an injunction do issue out of and under the seal of this court, directed to the said defendants and their confederates, their and each of their officers, agents, contractors, servants, and workmen, commanding and enjoining them, and each and every of them, that they, and each and every of them, desist and refrain from the acts aforesaid, which by this decree it is ordered, adjudged, and decreed they shall desist and refrain from doing. And it is further ordered, adjudged, and decreed, that the said defendants do pay to the complainants their costs of this suit to be taxed, and the damages sustained by the complainants by the unlawful acts of the defendants; and that it be referred to James Wilson, esq., one of the masters of this court, to take an account of all passengers and freight carried on the railroads of the said corporation defendants, or on any part thereof, in course of transportation from city to city aforesaid, distinguishing what passengers were soldiers, and what freight was horses or munitions of war, transported by order of or for the use of the government of the United States, and to take an account of and ascertain the damages

sustained by the complainants by the violation of their ex-
clusive franchise by the defendants; and that the parties be
examined before the master, and that the master proceed
with all convenient speed; and that the defendants pay to the
complainants as well their costs in this suit to be taxed, as
the damages aforesaid, and that the complainants have liberty
to apply on the foot of this decree in case of further violation
of said exclusive franchise by any device or means whatso-
ever, and all further equity is reserved until the coming in of
said report.

The Raritan and Delaware Bay Railroad Company, and the
Camden and Atlantic Railroad Company, have appealed from
so much of said decree as orders an injunction to be issued,
and an account to be taken against them.

The Delaware and Raritan Canal and the Camden and
Amboy Railroad and Transportation Companies, have also
appealed from said decree, on the following grounds:

That the Court of Chancery hath omitted and refused to
decree therein that the branch railroad from Atsion to or
near Jackson is an illegal structure, and should be discon-
tinued and broken up, and that it be taken up accordingly,
or to that effect; that the Court of Chancery hath omitted
and refused to decree that the Raritan and Delaware Bay
railroad, south of Ocean county, is an illegal structure, and
should be taken up, and that it be taken up accordingly, or
to that effect; that the said decree, in effect, declares that
the junction of the Camden and Atlantic railroad with the
Raritan and Delaware Bay railroad, at their necessary and
legitimate point of intersection, so as to form a continuous,
though circuitous line of railway from Camden to Raritan
bay, and which, with the aid of steamboats upon the Delaware
river and Raritan bay, will form a continuous line, and which,
by possibility, may be used for the transportation of passen-
gers and merchandise across the state between the cities of
New York and Philadelphia, constituted no violation of the
complainants' rights; also that the court hath decreed that

the complainants are not entitled to freedom from competition in their way business, as well as through business.

The appeals were argued by

*Mr. Williamson* and *Mr. Browning,* for the Raritan and Delaware Bay Railroad Company and the Camden and Atlantic Railroad Company.

*Mr. J. P. Stockton, Mr. Gilchrist,* and *Mr. Bradley,* for the Delaware and Raritan Canal and Camden and Amboy Railroad and Transportation Companies.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

The united Delaware and Raritan Canal and Camden and Amboy Railroad Companies were the complainants in the court below, and their object in appealing to that tribunal was to ask its aid in protecting them in the enjoyment of certain rights which they claimed to have derived from the state. The claim thus made was rested, in the main, on the acts of March second, 1832, and March sixteenth, 1854. In the second section of the former of these statutes, it is provided as follows : " That it shall not be lawful at any time during the said railroad charter, to construct any other railroad or railroads in this state, without the consent of the said companies, which shall be intended or used for the transportation of passengers or merchandise between the cities of New York and Philadelphia, or to compete in business with the railroads authorized by the act to which this supplement is relative."

By the first section of the act of the sixteenth of March, 1854, it is enacted : " That after the first day of January, in the year eighteen hundred and sixty-nine, it shall be lawful, without the consent of the said Delaware and Raritan Canal and Camden and Amboy Railroad and Transportation Companies, to construct any railroad or railroads in this state for

the transportation of passengers and merchandise between the
cities of New York and Philadelphia, or to compete in busi-
ness with the railroads of the said joint companies, without
thereby in any wise impairing the right of the state to its
stock in the said joint companies, or either of them, or to the
transit duties which the said joint companies are now re-
quired to pay to the state; and that it shall not be lawful,
before the said first day of January, eighteen hundred and
sixty-nine, to construct any other railroad or railroads in
this state, without the consent of the said joint companies,
which shall be used for the transportation of passengers or
merchandise between the cities of New York and Philadel-
phia, or to compete in business between the said cities with
the railroads of the said joint companies, or that may in any
manner be used, or intended to be used, for the purpose of
defeating the true intent and meaning of the act passed
March second, eighteen hundred and thirty-two, and entitled
a supplement to an act entitled 'an act relative to the Dela-
ware and Raritan Canal and the Camden and Amboy Rail-
road and Transportation Companies,' or of this act; which
intent and meaning are hereby declared to be fully and
effectually to protect, until the first day of January, eighteen
hundred and sixty-nine, the business of the said joint com-
panies from railroad competition between the cities of New
York and Philadelphia."

In exchange for the privileges thus bestowed upon these
companies, the state had, to some extent at least, received a
consideration of value; for, by the original charter, the rail-
road was declared to be a public highway, and the right to
subscribe for one fourth of the capital stock of the company,
and the privilege to take the road at an appraisement after
the expiration of thirty years, were likewise reserved. In
addition to these advantages, the state was subsequently made
the recipient of a large number of shares of the capital stock
of the joint companies.

That these several acts embody a contract between the
state and the complainants, is obvious. Nor is there any

more uncertainty with regard to the fact that by force of such contract the business of the Camden and Amboy Railroad and Transportation Company, between the cities of New York and Philadelphia, was meant to be protected until the first day of January, eighteen hundred and sixty-nine. To this extent, the theme of discussion is free from all doubt or obscurity. Whether, by force of the clauses of the compact above cited, or of any other provisions of the company's charter, or its supplements, its local business, intermediate the two cities just designated, is protected from competition, is a question which does not appear to me to be involved in the issues at present to be decided, because I regard it to be clear, that the road of the defendants cannot justly be considered as possessed of such a character. To make the road of the defendants liable to challenge from the incident of competition in local business, it would be necessary that such rivalry should, from its extent, be material; but as this, in the present instance, cannot be predicated, the controversy as to the complainants' right to interdict that kind of interference does not arise. This point is, therefore, dismissed from the consideration of the case.

Such are the franchises claimed by the complainants, derived from the grant of the sovereign power.

The defendants, on their part, have not called in question the fact of this grant, nor do they deny that, by a true construction of the compact, the scope above indicated is to be given to it; but their position is, that the grant itself is illegal and void.

The views of counsel upon this branch of the subject were presented under several heads.

I. It was insisted that this grant of exclusive privileges must be deemed invalid, on the ground that a certain arrangement, which the state had made with the joint companies, touching certain duties to be paid to the state in lieu of taxes, was in conflict with the power of Congress to regulate commerce between the states, by force of the Constitution of the United States.

The statutory provision, contained in a supplement to the charter of the company, to which this objection principally relates, is in the words following : " That the said company shall pay to the state the sum of ten cents for each passenger carried on the said railroad or roads across this state, between Delaware bay and Raritan bay ; said payments to commence when the said road is so far completed that passengers are transported thereupon across the state, instead of a ratable tax, as reserved in the said act of incorporation." These statutes relating to the company likewise contain a provision establishing a commutation of taxes for a prescribed rate of duty on all merchandise to be transported over this line of railroad.

The argument founded on this state of facts was this : that the duty thus stipulated was a burthen imposed almost exclusively on passengers and goods carried over this state from New York to Pennsylvania, and that a discrimination was thereby made against this inter-state commerce, in favor of the internal commerce of this state.

In support of this contention, the decision of this court in the case of *The Erie Railway Company* v. *The State*,[*] was, in a great degree, relied on. But it seems to me that the case now before us is clearly distinguishable, in principle, from the case cited. In the case of the Erie railway, the statute complained of imposed a tax on the business in this state of foreign corporations, requiring every such company to pay a certain transit duty on every passenger and on every ton of merchandise transported in this state, by or for such company, on any railroad or canal, for any distance exceeding ten miles, except passengers and freight transported exclusively within this state. The disputed tax had fallen upon goods which it appeared had, in the main, been carried over this state from and to adjacent states. That tax was held by this court to be illegal, for the reason that it was a burthen placed by this state on the commerce between the states. But it will be observed that in the decided case the tax adjudged to be void was placed upon foreign corporations. It

[*] 2 *Vr.* 531.

is true that it was in the form of an impost on the business of such corporations done in this state, but then that business was simply the commercial act of transporting goods and passengers over this state. All, therefore, that was within the reach of the taxing power of this state, was this commercial act between the states, and it was this act that was taxed. So, too, there was a clear discrimination against the goods transported from state to state ; for the act expressly exempted from all burthen, all transportation done by or for these foreign companies within this state. It was evident, therefore, that in the strictest sense this tax was a pure transit duty ; a mere tribute exacted from foreigners for the privilege of passing over the territory of this state.

Such, in brief, was the case referred to, and the present one is its opposite in every respect which is essential to the constitution of a legal dissimilarity. The Camden and Amboy Railroad and Transportation Company is a domestic, and not a foreign corporation. As such, it was competent for the legislature and such corporation to agree as to the amount of tax which should be paid. So, too, almost all the property of this company is here, and, for every purpose of taxation, this state is its proper domicil. Here, then, unlike the instance of the Erie Railway Company, are property and franchises of immense value, which can be, beyond all question, legitimately taxed.

Nor does the act in question discriminate, as it seems to me, in any material degree, to the advantage of the citizen of this state. The tax is laid on residents and non-residents alike ; citizens of this state, by force of its operation, have neither immunity nor preference. Nor is there any reason to suppose that there was any design to set this tax, by way of discrimination, on the citizens of other states, or that, in point of fact, such tax is unjustly borne by that branch of the business of the company. That such was not the purpose appears to be evident, from the fact that the company are not authorized to charge this tax in addition to the ordinary rate of fare which is prescribed in their charter. That

rate of fare is uniform ; the same maximum rate being fixed for both domestic and foreign transportation. The passenger carried from point to point by this road, within this state, cannot be charged beyond a certain sum per mile, and the citizen of another state, in crossing the state, is under the same protective limitation. The ten cents which the company is required to pay the state, for every passenger carried over the state from Amboy to Camden, cannot be charged by the company in augmentation of the fare of such passenger. In this condition of affairs, I can perceive no trace of a design to exact a premium from foreigners for the privilege of crossing this state. The arrangement was simply this : as between the state and the company, a charge of ten cents for each passenger transported across the territory of the state was to be paid ; this was adopted as the measure of taxation ; but the company was not authorized to charge against such foreign passengers any part of such tax. In this system nothing is observed which, like the law impeached by the Erie Railway Company, extorts from the resident of other states a price for the right to cross this state, either in person or with his goods. The form of the tax may be, and probably is, unfortunate ; for to those who look at the surface of things only, it doubtless seems to make an invidious distinction between citizens of this state and citizens of other states ; but is believed it would be difficult to prove that the tax in question falls more heavily upon non-residents than would the same amount of tax imposed on the road bed or on the rolling stock of the corporation. In such event, as the larger part of the business of the company is drawn from abroad, it would be the citizens of other states who would pay the greater part of such tax, for every tax upon the company must increase the cost of transportation, and must be paid by those for whom such business is done.

Hence, this first objection does not appear to me to be a solid one.

But before dismissing this branch of our inquiry, there is

another view which should not be passed without notice.  It
is this: that this question, touching the validity of the ar-
rangement of the complainants with the state, with regard
to the mode of taxing the business of the company, has no
proper application to this case   For, conceding the conten-
tion of the defendants on this point, what would be the result?
Would it be anything more than this: that the imposition
of the tax, in the mode prescribed, would be invalid, but that
such invalidity would not affect the remaining terms of the
contract between the state and the company ?   The argument
of the counsel of the defendants, in this particular, proceeded
on the idea that if this ingredient of the contract should be
found to be unconstitutional, it would taint the whole agree-
ment, and would thus invalidate those clauses which stipulate
for the exclusive franchise.   But the fallaciousness of this
assumption at once becomes evident, when we perceive that
if the principle be admitted it will go the length of annulling
the entire charter of the company; for if that part of the
grant guaranteeing the exclusive privileges, be void in con-
sequence of the stipulation with regard to a duty in lieu of
taxes, what other provision of the charter can, by any cor-
rect course of reasoning, be conserved?   The proposition
that a stranger to a contract can treat it as void, in every
particular, because one of its terms contravenes a constitu-
tional provision, is not, in its universality, true as a principle
of legal science.   The doctrine, whenever it exists or is appli-
cable, is founded in considerations of public policy, and its
whole value proceeds from its efficacy to repress bargains
which have been entered into against positive law.   But I
am not informed that in any case which has heretofore been
decided, this rule has been applied to the charters of incor-
porated companies, and indeed it is to be confidently antici-
pated that such an application will never be sanctioned.
There can be no question that where an unconstitutional
provision affects injuriously the rights of an individual, such
party affected may defend himself on the ground of its ille-
gality; but this concession falls far short of the position con-

tended for, which is, that an individual, not interested in the provision which is unconstitutional, can explode those other terms of the charter which, considered in themselves, are obnoxious to no legal objection. Suppose, for example, a charter of a railroad corporation provides for the acquisition of lands required for the enterprise, in all cases upon compensation, except with regard to a single person, whose lands are authorized to be taken without compensation; clearly this exceptional provision would be unconstitutional, but could it be reasonably pretended, that on this account the other terms of such charter would be invalid? The argument in favor of the defendants must stand or fall by this test. That argument maintains that the clause giving an exclusive privilege to the complainants, and which clause is set up against them, is void, not intrinsically considered, but because the mode of taxing the complainants with which they have no concern in this suit, is void.

The argument fails unless the proposition be true that a charter, from the presence of a single unconstitutional feature, is, as an entirety, defeasible at the instance of any person who may call it in question collaterally. The ground upon which this proposition was sought to be sustained was, that a contract which embraces any stipulation against sound morals or positive law, will not be judicially enforced. But this rule is not apposite, for the rights in question do not rest in mere contract. It is true that many of the terms of the charter of an incorporated company are regarded in law as forming a compact between the state and the donee of the grant; but it is likewise true that in all other respects such charter is possessed of all the efficacy of ordinary legislation. Between the company and the state a contract is formed; but with regard to strangers, the legislature, in creating a charter, enacts a law. When the right to take lands for the uses of the incorporation is conferred, such right becomes indefeasible on constitutional grounds, because the company becomes vested with such right by the legislative agreement; but the land owner must yield up his lands,

not on the basis of such agreement, but in obedience to a statute. And in the same manner, when this law, now drawn in question, has created this exclusive privilege, the defendants are called upon to submit to it as a law enacted in due course of legislation. Regarded from this point of view, the objection above considered disappears from the discussion, for it is clear that, by the rules of statutory construction, a law is never avoided as a whole, by reason of an illegality in one of its provisions. The same general law, therefore, which protects all the other rights of the complainants will protect the prerogative in dispute, which is as much a part of their organization as is their capacity to have perpetual succession. In my opinion, it would be just as competent for the defendants in this suit to dispute the corporate existence of the complainants as to gainsay, on the ground above considered, the existence of their exclusive franchise; for the one as well as the other is secured by the same law.

II. But again, in the second place, it was argued that the grant of the exclusive privileges to the complainants was invalid, from the fact that, by force of such grant, the legislature bound itself not to make, or permit to be made, any other railroad across this state, which could be used in the course of trade between the cities of New York and Philadelphia, for the period of thirty years. The ground of this insistment was, that this arrangement was, essentially, a regulation of inter-state commerce, confining it, during the period specified, to a single channel of inter-communication.

In the consideration of this point, it is to be remembered that we have to do with legal objections only. The solution of the question does not depend, in any degree, on the fact of what is due, under the obligations of international comity, from one state of this nation to another state. Nor is it to be affected by a consideration of what line of conduct a state should adopt from the dictates of a wise or generous policy. It may well be conceded, as it is conceded to the fullest ex-

tent, that it is the part of wisdom as well as an exhibition of a spirit of becoming amity for each state to afford to every other state all reasonable facilities for commerce and mutual intercourse within her power. But these are duties evidently emanating from the international code—the *jus gentium*. They are not, in the sense of being enforceable, legal duties, and consequently, their correlatives are not legal rights. One state cannot, as of right, demand that a certain mode of passage shall be provided for her citizens and their property by any other state. It follows, therefore, inevitably, that the power of each state over the construction of her own roads and other internal improvements, is, so far at least as her own action is concerned, entirely supreme. No state can be compelled to make a railroad, or canal, or ordinary highway. Nor can she be compelled to keep up or in repair those highways or improvements which she may have constructed or authorized. It would be difficult to find any legal impediment, within the power of other states, or of the United States, which could be interposed so as to prevent this state, in the exercise of her pleasure, from closing up, or forbidding the use of any highway within her domain. This is a branch of government which has been administered exclusively by the state authorities, from the formation of this people as a nation to the present day ; and so far as is known, the right has never been called in question. If, then, a state has the undoubted right to exercise a discretion, and either to build or to refuse to build any given road, why is she forbidden to agree not to build, nor permit to be built within a definite period, a road between certain termini? Whether a given road be at present required, is, it will be admitted, a question which addresses itself to the discretion, purely, of the legislative department of the state government. Nor will it be denied that the decision of such department, on that matter, will be final. How, then, can it be said that the question, whether a second or other road may become necessary in the future, within a certain limit of time, is not to be referred to the same discretion? The

argument was, that the agreement of the state not to permit the construction of a railroad within the time designated, condemned commerce, during such interim, to one channel. But suppose, in the absence of any such conventional restriction on the power to enact laws, a second road had been applied for, and the legislature had refused, as it legitimately might, to authorize the improvement, would not, in the same sense, such refusal have been a regulation of commerce? For the time being, it would have compelled commerce over the state to pursue one line of communication; it would have refused it a second avenue; and, on the basis of the argument advanced on this topic, would have been an unconstitutional regulation of commerce. I think it must be conceded that a refusal to do, or an agreement not to do that which cannot be legally exacted from a state, cannot, in the nature of things, be a violation of any law, either the law of the constitution or the general law of the land. The argument in behalf of the defendants, on this subject, is founded in the fallacy that each state is under a legal obligation to give to every other state the facilities requisite for inter-state commerce. But this assumption has no foundation in any of the regulations by which the states are constitutionally bound together. There is no provision nor any indication in the Constitution of the United States, to the effect that one state, as a matter of positive duty and by way of special provision, shall give a right of passage over her territory to the citizens of another state. Nor would the provision, if such existed, be a wise one. Indeed, it seems scarcely possible to present to the imagination, an obligation which would have a greater tendency to introduce the most inimical dissensions. If a state has a constitutional right to demand a transit way over the territories, adjacent or distant, of other states, where would be the beginning, or the end, or the limit, to such claims? What would be full performance, by the servient state, of such an obligation? What tribunal could arbitrate, in a satisfactory manner, between such perplexed

and indefinite interests?. There is every reason to believe that such a doctrine would lead to an inharmony and collision of opinion, which would be attended with the worst consequences to the nation. But, fortunately, there is no such obligation due from a state to a state; and, as a consequence, each state is free to make, to refuse to make, or to agree not to make, railroads or other improvements on her own domain, at her pleasure. The only obligation of a state, in this respect, is, to allow the citizens of other states to use equally with her own citizens, such roads or highways as in her discretion she may see fit to construct.

Nor is this obligation at all likely to prove inefficient in compassing the end for which it was designed, for under its operation one state cannot construct a railroad, or other similar improvement, without increasing in the same degree the avenues of commercial communication for the use of the citizens of every other state, and thus the intercourse between the states is placed under the shelter of the all-sufficient law of social development. A state that provides for her own citizens the means for internal commerce, must, almost of necessity, provide the means of inter-state commerce for the citizens of other states. That a state will ever withhold such means from her own people, it is not reasonable to suppose, and, consequently, she will not refuse such means to the citizens of other states; and it is upon this solid ground of self-interest that the constitution has rested its provision for the social and commercial intercourse between the various parts of the country. But what is now insisted on is, that although a state must, by force of the laws regulating its own growth, give these means of intercourse both to her own citizens and to the citizens of the other states, still she cannot be compelled to do so on the ground of a duty of positive legal obligation.

The result therefore is, that the restriction, during the period specified, on the legislative power in this state, to authorize the construction of a railroad to compete in busi-

ness with that of the defendants to the extent designated, is not open to the objection above considered.

. But, in addition to the foregoing observations, if any further answer to this head of the argument were requisite, it would be sufficient to say that, conceding that the legal duty contended for exists on the part of a state, and that the ability to discharge such duty cannot be suspended by agreement, nevertheless the stipulation in the charter of the complainants, which is called in question, is not unconstitutional. To show the truth of this conclusion we have but to recollect that, in legal effect, the prerogative of the state to construct such railroads as she may deem necessary, is not, by force of her agreement with the joint companies, suspended for a single instant. The doctrine that the franchises of a private corporation can, like property belonging to natural persons, be taken for public uses upon compensation rendered, is now unquestioned law. The consequence, therefore, is, that when the state agreed not to permit any other railroad to be constructed within the time specified in the charter, in point of law such stipulation imported that such act should not be done, unless upon a reasonable indemnification. Consequently, as the state did not incapacitate herself from the discharge of the alleged duty, the argument must fail, if for no other reason, at least for want of premises to support it.

The foregoing were the principal grounds of objection against the validity of the rights claimed by the complainants, which were urged on the argument before this court by the counsel of the defendants, with so much ingenuity, learning, and ability. It is true, that there was one other topic which was somewhat pressed, but I do not deem it of sufficient weight to call for any extended discussion at my hands. This contention was to the effect that the legislature could not, legally, agree with the complainants not to permit, for a specified term, competition in their business, as such a compact was a derogation from the power of subsequent legislatures. This argument is not new; it has often been pressed

upon the attention of the judicial tribunals, both state and national, but, it must be confessed, with indifferent success. The fact is, it would seem undeniable that the doctrine is an explicit denial of the right of a legislature to make a contract binding on future legislatures, for it is not easy to conceive any ordinary contract which will not, in some measure, restrict the freedom of action of those who are parties to it. Such a theory, therefore, is obviously inconsistent with that long line of adjudications which have their root in the case of *Dartmouth College* v. *Woodward.* But this objection needs no further notice, as it is most completely refuted in the learned opinion which was read in this case in the Court of Chancery.

It will be perceived that my general conclusion on this part of the case is, that the law which confers upon the complainants the exclusive right to carry passengers and goods between the cities of New York and Philadelphia, by means of a line of travel of which a railroad forms a part, is, in all respects, valid and constitutional.

The next inquiry, then, which in the natural order of the subject is presented, is, have the defendants infringed these rights of the complainants? The point rests upon matters of fact and the proofs in the case, a minute discussion of which would subserve no profitable purpose. I shall, therefore, merely state such circumstances as I deem to be established by the evidence, and which will serve in elucidation of the conclusions to which I have come.

The defendant, the Camden and Atlantic Railroad Company, was chartered on the seventeenth of March, 1852, and, in pursuance of the authority thereby given, laid their road from the city of Camden, through the counties of Camden and Atlantic, a distance of about sixty miles, to the ocean at Absecom inlet. The other defendant, the Raritan and Delaware Bay Railroad Company, by their charter, dated on the third of March, 1854, and by certain supplements thereto, was empowered to construct a railroad from some suitable point on Raritan bay, eastward of the village of Keyport, in

the county of Monmouth, through the counties of Monmouth, Ocean, Atlantic and Cape May, to Cape Island, on the Atlantic ocean. The bearing of the route thus prescribed was, in its direct course, nearly parallel with the line of the sea coast, and, running on that course, would have intersected the Camden and Atlantic railroad at a distance of about forty miles from the city of Philadelphia. This company, after entering the county of Burlington, turned their road about ten miles from the direct route thus prescribed, so as to carry it to the village of Atsion, which is situated near the northwest corner of the county of Atlantic. The Camden and Atlantic Railroad Company, by its charter, was authorized to construct a branch or spur from their road to the village. of Batsto, in the county of Burlington, and by an agreement entered into on the twenty-fifth of October, 1861, between that company and the Raritan and Delaware Bay Railroad Company, it was, amongst other things, stipulated that the latter company should construct this Batsto branch; and that it should furnish the means, control the construction, designate the point of its termination on their road, and determine the cost of the work. It was further agreed, that the Camden and Atlantic Railroad Company should transport, or permit the Raritan and Delaware Bay Railroad to transport, in connection with their road, all locomotives, passengers, and freight, between the said point of intersection and the termini of their road, and should procure ferry boats to be used at the termini of their road and branches on the Delaware, and should convey thereon all the freight, passengers, and cars aforesaid. There was also a provision that the number of trains, the time of running, and the rates of fare, should be regulated by the Raritan and Delaware Bay Railroad Company. By a supplemental agreement of the sixteenth of February, 1862, it was further provided, that in case the original agreement was not carried out in good faith, the Raritan and Delaware Bay Railroad Company should have the right to take possession of and manage the Camden

and Atlantic road, so as effectually to carry out the purpose of said agreement.

The road of the Raritan and Delaware Bay Railroad Company was then completed to Atsion, and, in pursuance of the agreements above specified, the branch of the Camden and Atlantic railroad, called the Batsto branch, was made to this same village, and by this means a continuous line of railroad was perfected between the Raritan bay and the Delaware river at Camden. The road thus constructed went into operation in September, 1862, and in the month of November of the same year, boats were running regularly to the northern terminus of this route, and thus a complete line of communication was established between the cities of New York and Philadelphia. The carrying business between these cities was in the hands of transportation companies, and by an agreement, dated the twentieth of December, 1862, between one of these carriers and the Raritan and Delaware Bay Railroad Company, it was stipulated that the agreements above mentioned between the said railroad companies, should be deposited with a designated agent for the benefit of such carriers.

The result of this statement of facts, presents the case in this aspect: The Raritan and Delaware Bay Railroad Company was, by its charter, empowered to build a road in a line nearly direct from a designated point on Raritan bay to Cape Island, on the Atlantic ocean. The capacity is given to it to run locomotives and cars, to carry passengers and freights, to take tolls on such line. This is the entire scope of the legislative grant; the corporate body is vested with no legitimate powers beyond these. Now, in point of fact, what it has effected is this: it has established a continuous line of railroad from the waters of Raritan bay to the waters of the Delaware, opposite to the city of Philadelphia. This end has been reached by a deviation from its prescribed route, of about forty miles. Nor will the suggestion that this measure has been accomplished by means of the privileges conferred on the Camden and Atlantic company, remove

the objection. That company could not transfer its capacities, or any of them, to another corporation. The right to build a branch to Batsto, the right to run cars on such branch and on its main road, and to carry passengers and goods, and receive a return in tolls, were franchises which could not be surrendered to another corporation. No legal proposition can be more undeniable than that corporations cannot amalgamate their powers for the accomplishment of an end which has not a legislative sanction. It would be superfluous to point to the authorities in support of so well settled a principle. In my opinion, it was just as illegal for the Raritan and Delaware Bay railroad to build a branch to the Camden and Atlantic road, and, by means of a compact, to obtain a right of way over the last named road to the city of Camden, as it would have been for the first named company to have constructed a road for itself from Atsion to Camden. The objection to each act is the same; in each case the corporation exercises an authority not conferred upon it by law. Nor do I think any example could more forcibly display the necessity for the restriction on the powers of corporations, which is above indicated, than this present case. For, if this company had asked from the legislature a charter to establish a railroad line so as to unite Raritan bay with the Delaware, in the vicinity of Philadelphia, no person at all acquainted with the history of the public improvements of the state, can doubt in the least that such application would have been summarily rejected. But, for the present purpose, it is sufficient to observe that the line in question has been set on foot in violation of law, and to the prejudice of the rights of the complainants. And I am also further satisfied that the two corporate defendants have united and co-operated in the establishment of this line with a view to the business between the cities of New York and Philadelphia. This purpose, I think, is to be seen in every feature of the case—in the pleadings—in the evasive and equivocal answers of the defendants—in the depositions—in the agreements—and in the sequence and coincidence of events. Indeed, it seems to me

impossible that any candid person can look at the map of the state, with the route of this road and the deviations from such route marked upon it, and entertain any doubt upon the subject. The object conspicuously was, to compete in business with the complainants; the instrumentalities used were the covert deflection of the route of the one road to Atsion; the construction of the spur to the other road, under the pretence of building the Batsto branch; the agreements between the two confederate defendants, and the arrangements with the transportation companies. These are characters of the transaction which can bear but one meaning; and as the illegitimate scheme has been carried into effect, it is evident that the complainants have just ground of complaint, and are entitled to the protection of a court of equity.

But before proceeding to the consideration of the measure of relief which should be granted, it is proper that I should here remark, that my conclusion from the whole case would not have been different from what it now is, if I had been convinced that the complainants were not entitled to the exclusive franchise embraced in what is called the monopoly clause in their charter. With that clause altogether expunged, I should still hold that they would be entitled to relief in this suit against these defendants. In this respect, I put my opinion upon this ground. Waiving the express grant of exclusive privileges contained in their charter, it is obvious that the complainants would still be invested by legislative authority, with the franchise to make, possess, and use a railroad over this state between certain termini, and to establish a line of communication for the transmission of passengers and goods between the cities of New York and Philadelphia. Now it is admitted, that it has been definitely decided that such franchise does not divest the power of the legislature to grant to another company a similar privilege. Such was the result in the case of *The Charles River Bridge* v. *The Warren Bridge*, 11 *Pet.* 420. But it will be remembered that it was not until after an arduous struggle, marked by a memorable divergence of judicial

opinion, in both the state and federal courts, that the doctrine was established, that the mere grant of a charter to a company would not, *per se*, prevent the state from investing another company with a privilege which would interfere, by way of competition, with the enterprise anthorized by the prior grant.   Judge Story dissented from this view of the law, and in an opinion characterized by strenuous argument and rich with learning, advocated the opposite side, contending that the gift of a franchise by the state necessarily imported that the state would not, by any subsequent concession, derogate from the value of its own prior grant. But the right of the state to repudiate, in these matters, all obligations, except such as are inherent in express contract, was settled by the predominance of one vote in the judicial consultation.   Such, undoubtedly, is the rule of law, but it is not in this light that the present case is presented.   The defendants are not here claiming a statutable right to set up a line of railroad to compete with the chartered rights of the complainants.   On the contrary, there is no pretence that the state has yielded her assent to any such competing enterprise.   A railroad for popular use is *publici juris ;* it cannot be legally erected without a legislative permission ; and the consequence is, that the road established by the defendants, in excess of their legitimate powers, is a public nuisance, and an usurpation of the rights of sovereignty vested in the body politic.

The controversy in this case, therefore, is between the complainants and mere wrong-doers, and the question thence arises, has a railroad company any redress against a competition unwarranted by law, and which materially affects the value of the privileges with which it is legally vested ?   I am at a loss to perceive upon what premises, or by what course of reasoning, other than an affirmative answer to this question could be justified.   A franchise to build a railroad for public use and to take tolls, is property, the title to which is held for the sovereign ; and, like every other thing susceptible of private ownership, it must, of necessity, be under

the protection of the laws. Unless it can be shown that this species of right is altogether anomalous in its character, and is under the control of exceptional rules, a wrongful invasion of such right cannot but be followed by a legal vindication. Theoretically, then, the claim to judicial redress is clear, and all legal analogies, as well as decided cases, concur in support of the same view. At common law, franchises of a similar nature, considered with regard to remedial justice, were placed on the footing of other proprietary things. "If a ferry," says Blackstone, "is erected on a river, so near to another ancient ferry as to draw away its custom, it is a nuisance to the owner of the old one." 3 *Black. Com.* 219. And to the same effect is the case of *Blisset* v. *Hart, Willes' R.* 508; the court, speaking of a ferry, say: "It is a franchise that no one can erect without a license from the crown; and when one is erected, another cannot be erected without an *ad quod damnum.* If a second is erected without a license, the crown has a remedy by a *quo warranto,* and the former grantee has a remedy by action." The books are replete with cases sustaining actions for encroachments upon the exclusive enjoyment of privileges of this class. The rule of the common law is clearly indisputable. The franchises to maintain markets and toll bridges belong to the same category, and were under the same protection. And these principles of the common law have been applied in their full vigor to this same class of franchises, when created by statute. In the case of *The Newburgh Turnpike Co.* v. *Miller,* 5 *Johns. C. R.* 101, a competing free road had been erected, without authority of law, in the vicinity of a turnpike, and Chancellor Kent enjoined the former from the continuance of the interference, declaring that the rules of the common law relating to ferries, fairs, markets, and toll bridges, were applicable to any of these similar privileges created by statute. And in the case of *The Croton Turnpike Co.* v. *Ryder,* 1 *Johns. C. R.* 611, the same principle was recognized and made the ground of the decision. I am aware that in the case of *The Auburn and Cato Plank Road Co.* v. *Douglass,*

5 *Seld.* 444, both these adjudications are treated as over-ruled; but without expressing any opinion as to the correctness of such result, it is sufficient to say that the later decision is not based on any ground which can detract anything from the value of the prior adjudications as precedents of weight upon the point now under consideration. The overruling case, indeed, expressly admits the principle now insisted on. It seems to me, it must be admitted that the rule of law, apposite to the matter now in hand, is entirely settled. When, therefore, the complainants obtained from the state the right to establish their road, I think that, by the intrinsic force of such grant, such franchise was exclusive against all persons but the state. A competing road, set up without a legislative license, is a fraud upon such grant, and is a plain public nuisance. The consequence is, that the case of the complainants, in my opinion, does not, necessarily, rest upon the express clause in their charter guaranteeing to them an exclusive privilege. After the first of January, 1869, when the effect of that clause will be spent, the defendants, as at present constituted, will have no greater right than they now have, to establish a line of railroad to compete in business with the complainants between the cities of New York and Philadelphia.

The only point remaining to be disposed of, is the question as to the extent of relief to which the complainants are entitled.

The rule of equity is, that the complainants are entitled to complete relief; and they claim that the only course which will fully protect them will be the actual abatement of that portion of the roads of the corporate defendants which has been constructed for the purpose of violating their rights. This part of the case has given me some perplexity, and I am not yet entirely certain that the relief thus specified is not the proper measure. It is clear, that as long as this illegal structure remains, some loss must fall upon the complainants, for, beyond any question, in spite of every effort which can be made, some passengers will be carried by this

line of the defendants between the two cities. Its existence, too, is a standing menace to the rights of the complainants. It imposes upon them the trouble of vigilance. It is likewise evident, that very serious questions, involving the essential rights of the complainants, may arise from this same source. Indeed, on the argument of this case, one of the counsel of the defendants contended that the road of the defendants, being an existing highway through the state, the inhabitants of other states could not be prevented from its use. If this position were deemed tenable, the course of the court would be clear, for in such a position of affairs the abatement of the road would alone afford the protection due to the justice of the case. But I do not concur in the opinion thus expressed, for in my estimation the citizens of other states cannot claim the right to use the highways of this state in a mode prohibited to our own citizens. Citizens of other states are entitled to all the privileges that are not strictly local, which belong to the citizens of this state, but they cannot assert, by way of prerogative, a right to violate with impunity the laws of this state. However, the suggestion of such a doctrine should put the court upon its guard, and should induce it to leave nothing undone which is necessary to ensure the complainants against every reasonable apprehension of harm.

After full reflection, I have concluded that, at present, it is not indispensable to the ends of equity in this case, to abate any part of this road of the defendants. If the defendants should, however, hereafter claim any right hostile to the complainants, from the mere fact of the existence of this illegal structure as one of the highways of the state, its actual abatement would then become, in the course of justice, an absolute necessity. But, under existing circumstances, so decided a course would seem to be uselessly severe. The disruption of any portion of this road, so as to disturb its use for local purposes, would evidently occasion great loss and inconvenience to persons living in its vicinity. This suit has now been long pending; the complainants have suffered this

appeal to lie idly in this court for some years, and in the interim property along the line of this highway has accommodated itself to the present condition of affairs. In giving adequate relief to the complainants, it is highly desirable to avoid doing all needless detriment to the public.

I have already said that, in my opinion, this road which the defendants have set up, when used as a link in the line between the cities of New York and Philadelphia, is a nuisance, and an infringement of the legal rights of the complainants, and will remain such after the first of January, 1869, and until the defendants shall have acquired a grant of power in ratification of their enterprise from the state. By the decree of the Chancellor, the use of this road, as a competing line between the two cities, has been enjoined. That decree appears to have been based upon the monopoly clause in the charter of the complainants, and it is obvious, therefore, that a doubt may arise whether such injunction may not lose its efficacy after the first of January, 1869. It seems to me this point should not be left in uncertainty. The complainants are entitled to have their rights, which are involved in this controversy, clearly and definitively settled by the decree in this cause. For the purpose, therefore, of removing all obscurity as to the extent of the relief afforded, the decree of the Court of Chancery should be modified, and the two corporate defendants should be enjoined from ever hereafter using, by force of their present charters, that section of road lying between the village of Jackson and the point near Hampton, in the county of Burlington, where the Raritan and Delaware Bay Railroad Company begins to deviate from the direct route to May's Landing, or any part of the same, as a link in the line of communication between the cities of New York and Philadelphia. And as a measure precautionary against any possible injury to the complainants, which may arise from the existence of the road of the defendants as a *de facto* highway across the state, a privilege should be reserved to the complainants, in case the defendants should set up hereafter any adverse claim by reason

thereof, to come in and have, as an established right, an immediate abatement of so much of that portion of the road above designated as will effectually sever the connection between the two roads of the corporate defendants. The residue of the decree of the Chancellor should remain unaltered, the defendants paying the costs of both appeals.

DALRIMPLE, J. I concur in the result to which the Chief Justice has come, in the opinion just read, save in respect to the relief to which the complainants shall be entitled in case of violation by the corporate defendants, or either of them, of the injunction granted.

In my opinion, the complainants, in case of violation of the decree of this court, should be left free to apply for, and the Court of Chancery to grant, such relief as may be equitable and just, after consideration of all the circumstances of the case, and after hearing all parties who may be entitled to be heard.

The decree of the Chancellor was modified in the particulars stated in the opinion of the court, and in all other respects affirmed.