THE SPERRY & HUTCHINSON COMPANY

*v.*

HERMAN HERTZBERG.

[Filed March 4th, 1905.]

1. Trading stamps are choses in action, practically negotiable orders for merchandise, transferable by all the means by which such property may be transferred. When they are issued without limitation on the power of the holders (who have acquired them as premiums from merchants with cash purchases) to transfer them, the company issuing them has no power, by a subsequent change of its plans and contracts with its customers, to limit the transferable quality of those previously issued, which have passed to dealers and traders in the regular way.

2. Where a company has issued trading stamps, made assignable without limitation, it cannot, in the absence of special legislation, prevent the use by a merchant of such stamps as may have been given by its cus-

tomers to dealers and traders with them in pursuance of the contract of the company with its customers, even though such merchant be not a customer of the company, and even though such use be injurious to the business of the trading stamp company. Courts will not create novel rules of law for the protection of novel schemes of transacting business. Men must make their novel business schemes fit existing laws. It is for the legislature, and not the courts, to create new laws to protect new schemes of business.

3. The primary right claimed by the complainant, if it exists, is strictly legal, as distinguished from equitable, in its nature, and hence, being doubtful and unsettled, cannot be protected by an injunction from the court of chancery. If the rule against the use of an injunction in this class of cases at the present time has any exceptions, there are no facts on which to found such an exception in this case.

On motion for a preliminary injunction. On bill, affidavits and answering affidavits.

*Mr. Addison P. Rosenkrans* and *Mr. W. Benton Crisp* (of New York), for the motion.

*Mr. David H. Bilder* and *Mr. William B. Gourley, contra.*

STEVENSON, V. C.

The complainant is a New Jersey corporation engaged in the trading-stamp business in the city of Paterson as well as in other cities and towns throughout the country.

The defendant, the proprietor of a department store in the city of Paterson, is charged with various invasions of the rights of the complainant in respect of its trading stamps and trading-stamp business.

The order, which was made *ex parte* on April 22d, 1904, upon the filing of the bill, restrains the defendant from using in his business "or giving to persons who may trade or deal with him, any of the complainant's trading stamps * * * except such trading stamps as said defendant may lawfully obtain from the complainant, or use in his business with its consent, and except such trading stamps as may have been given by the customers of the complainant to dealers and traders with them in pursuance of the contract of complainant with such customers."

The exception to the restraint contained in the last three lines above quoted is the subject-matter of the entire argument on this motion. The defendant submits until the final hearing to the injunction as it now stands qualified by this exception; the complainant insists that the exception should be expunged. The subject for investigation on this motion is the right which the defendant claims to give out the complainant's trading stamps as premiums to his (the defendant's) customers, in such amounts and on such terms as he (the defendant) may see fit to prescribe, provided the stamps so given out have theretofore been lawfully issued in pursuance of the contract between the complainant and its subscribers.

1. The complainant's trading stamps are adhesive stamps similar in size and general appearance to ordinary postage stamps. They are delivered by the complainant to its subscribers who are merchants in various lines, in pads of sheets, which pads often contain five thousand stamps. The stamps are so arranged that they may be readily separated in any desired quantity, and they are delivered by the merchant to his customers as a premium for or discount upon every cash purchase amounting to ten cents or over. For a cash purchase amounting to ten cents the customer may demand and receive one stamp, and in like manner he is entitled to another stamp for every additional ten cents which he may pay in cash for the article or articles which he purchases. The complainant also supplies the public with small pamphlets known as trading-stamp books which purport to give an explanation of the trading-stamp system and which contain leaves to which the stamps may be conveniently affixed. When any person has attached to the pages of one of these books nine hundred and ninety stamps, which number exactly fills the book, he may present his book of stamps at the complainant's warehouse or store for redemption. The complainant maintains a store where useful and valuable articles are kept for exhibition so ticketed as to show the public how many stamps will purchase each article. The complainant advertises in its trading-stamp books the name and business of each subscriber to whom it delivers its stamps, and who are authorized to issue the same to their cash cus-

tomers. The ordinary price which the merchant, the subscriber, pays to the complainant for the use of the stamps is fifty cents per hundred, although when large amounts are taken the price is reduced to thirty-five or forty cents per hundred. What the merchant therefore pays for his share of the benefits of the system is from three and one-half to five per cent. on all his cash sales upon which trading stamps are demanded by his customers. The complainant claims that it buys large amounts of goods at the lowest possible rates, and that after paying all the expenses of its business it can supply to the collector for his trading stamps a valuable article which at retail would cost about what the merchants who issued the stamps have been obliged to pay the complainant for them. The inference is unavoidable from facts of common knowledge, that in the ordinary operation of this trading-stamp system large numbers of stamps are liable to be paid for and issued by merchants which never in fact will be presented to the complainant for redemption.

The whole success of the trading-stamp business manifestly depends upon the creation and maintenance of a wide general demand for the stamps among the shop-going public. Without such demand merchants would have little inducement to contract with the complainant for the stamps, and of course the purchase of the stamps from the complainant is the only source of the complainant's gain.

The rights of all parties in these trading stamps, from the time they leave the possession of the complainant until they are returned to and redeemed by it at its store, are, to a very large extent, created, defined and limited by the contract which the complainant makes with its subscribers.

In every case, as the bill sets forth, this fundamental contract is, in all particulars affecting this present investigation, precisely the same. The trading stamp itself bears on its face no obligation of the complainant whatsoever; its whole value is derived from the obligation of the complainant in its contract with its subscribers and the representations which the complainant makes to the public in various ways.

It is expressly provided in the contract that the "property in and title to said stamps remain" with the complainant. The

pads of stamps have attached to them a conspicuous printed notice to the effect that the pad is the property of the complainant, and that the subscriber has agreed to give the stamps only to customers. The stamp, however, bears no notice upon it which indicates in any way that it may not be transferred from hand to hand, like any other chattel.

The contract leaves no room for doubt as to the method in which the subscribers, the merchants, may lawfully issue the stamps. It provides for the redemption by the complainant of "such stamps as are issued *in the regular way* by merchants duly authorized by the first party to handle the same," and the subscriber expressly agrees to give out the stamps at the rate and in the manner above described, and also agrees "not to dispose of said stamps in any other way." It is perfectly plain that no stamps can be lawfully issued under this contract except by subscribers to their customers in accordance with this definite method of business, and it is equally plain that the only obligation of the complainant to redeem its own trading stamps is confined to such stamps as are issued in the regular way. What is the "regular way" of issuing these stamps under this contract is a matter about which there is no room for controversy. It follows that every person who in any way acquires a trading stamp of the complainant which has been issued in any other manner than by one of the complainant's customers, in pursuance of the contract, obtains no right of redemption against the complainant.

The contract also provides that the complainant shall keep a supply of goods and merchandise in its store "with which to redeem said stamps when presented in the above-mentioned books (in lots of nine hundred and ninety (990) stamps), collected in the regular way." I think it is quite evident, and the conclusion accords with the argument of counsel for the complainant, that the regular issuer and the regular collector of these stamps are the two parties on the respective sides of the transaction which results in creating and setting afloat the obligations of the complainant which the stamps represent. The phrases "issued in the regular way" and "collected in the regular way," in fact, have the same meaning—describe the same trans-

action, and one or the other of these phrases is naturally employed according to the point of view from which the transaction is regarded.

That the right of redemption represented by a stamp which has been issued in the regular way, and therefore has been collected in the regular way, is assignable is admitted by counsel for the complainant, and clearly appears from the contract, the advertisements of the complainant, and the whole tradingstamp scheme as it exists in practical operation. The contract requires the complainant to "maintain a store for the purpose of redeeming such stamps as are issued in the regular way," &c. As the stamps pass from hand to hand, and no record of the persons to whom they are issued is provided for, the evident meaning of the above provision is that "such stamps as are issued in the regular way" are entitled to redemption by whomsoever they may be presented. The other provision quoted above leads to the same result. The complainant must keep a supply of goods and merchandise "with which to redeem said stamps when presented in the above-mentioned books, in lots of nine hundred and ninety stamps, collected in the regular way." This means that anyone may present stamps for redemption, provided they are brought to the complainant in the manner specified and have been collected by some person or persons in the regular way.

In the "explanation," more or less complete, of the tradingstamp scheme, set forth in the trading-stamp books, the complainant, addressing anyone who may read, says, "You also can buy cheaper; you also may obtain a discount—in the way of green trading stamps—which *may be taken* to our store and exchanged for an endless variety of goods." The use of the phrase "which may be taken," instead of the phrase "which you may take," is most significant, and indicates how carefully the complainant avoids creating the impression that the collector of the stamp on its issue is the only person who has the right to present it for redemption.

The trading-stamp system of the complainant involves, as a valuable if not an essential element, the general assignability of the right of redemption which every stamp represents after

it has once been issued by one of the complainant's subscribers in accordance with his contract, and therefore has been collected by a cash customer of such subscriber. If the complainant should confine the right of redemption to the original collector of its stamps, the inference is inevitable that the popularity of the trading stamp would greatly wane. No person could honestly obtain a premium who did not expend at least $99 in cash purchases of goods from the complainant's subscribers—an amount equal to a fifth or sixth of the annual income of many families belonging to the class to whom the trading-stamp proposition probably is most attractive. Many shoppers who would never demand trading stamps upon their purchases for their own use probably call for the stamps which they have paid for because these stamps are valuable in the hands of other persons to whom they may be transferred. Families and neighbors and friends may mass their stamps and give one of their number the benefit of the whole.

2. I think that it is very important to the comprehension of this case to perceive at the start that while the trading stamp is of no value whatever, and evidences no right of redemption until it has "been issued in the regular way" by a subscriber of the complainant to his cash customers, and therefore necessarily has been "collected in the regular way" by such customer, after such issuance and collection, it represents a property right of quite definite pecuniary value, which the complainant has most distinctly and intentionally made generally transferable. This property right is bought and paid for by the collector. The stamp is practically a negotiable order for merchandise. It is a mistake to regard it as a gratuity. Shoppers are invited to buy merchandise for cash from the complainant's subscribers because for their money they get certain articles which the subscribers purvey, and also the right to select and receive certain other articles which the complainant purveys. Under this trading-stamp scheme $100 buys goods of that price or value from the merchant, and goods of the value of three, four or five dollars from the complainant.

3. The claim on behalf of the complainant that it retains title to the trading stamp as a chattel after it has been regu-

larly issued does not call for extensive discussion. Assuming that such title is retained, I do not think that the fact affects any essential element of this case. The thing of value which the collector pays for and acquires and has the right to transfer is not the piece of paper and the ink thereon which constitute physically the trading stamp, but the absolute property right which the stamp represents and evidences, which counsel for the complainant accurately refers to as a chose in action. This chose in action is created by the complainant and put on the market for value and made transferable from holder to holder by all the means by which such property may be transferred. The retention of title in the paper cannot interfere with the use of the paper as the token or evidence of the chose in action, over which the complainant has no control. The complainant has dedicated the paper to the use of the holder of the chose in action which the paper represents and evidences, so far as is necessary to the full enjoyment of such chose in action. Whatever may be the technical status of the complainant's title to the stamp as a chattel in a court of law, a court of equity will not permit the complainant to assert such title adversely to the interests of the holder of the right of redemption, the chose in action, of which the stamp is the necessary evidence. In my opinion, the title of the complainant to the stamp as a chattel, after it has been issued in the regular way, is about as valuable as the title of the maker of a negotiable promissory note to the paper on which he writes it after he has put it in circulation. Assuming that title can be retained in such a case, it certainly is held subject to all the rights of the holder of the note as a chose in action, and can only be asserted so far as is consistent with those rights. This safe conclusion, as applied to the stamp, is supported by the fact that the stamp bears on its face no notice that the title to it as a chattel is not transferred when the right which it evidences is transferred. The complainant, by its own conduct, has made the stamp as a chattel attend upon and follow the chose in action which the stamp represents.

4. A point which at every stage of our inquiry must be kept in mind, is that the obligation of the complainant represented by a regularly-issued and collected stamp is assignable without

limitation of any kind, so far as is disclosed by the contract and notices of the complainant out of which the obligation arises. All the world is invited to collect the stamps from the complainant's subscribers, strictly according to the contract, and then all the world is invited to acquire in any lawful way these stamps which have thus been regularly collected and put them in lots of nine hundred and ninety, and present them for redemption or transfer them to other persons. A stamp once regularly issued is transferable by gift, sale or bequest, and may pass through many hands before finally it is placed with other stamps in a book and presented for redemption. The system of the complainant, which is based upon the maintenance of the popularity of the stamp among the shop-going public, not only permits but encourages the collection of these regularly-issued stamps in books by children and other persons, whose personal expenditures would never amount to enough to give them the number of stamps required for a premium. The reason is quite apparent why the complainant avoids overloading the trading stamp or the right which it represents with conditions affecting its redemption. It is quite natural that the complainant should endeavor, with the aid of a court of equity, to restrain the transfer of its stamps, when such transfer is injurious to its business, instead of attempting to impair or qualify its obligation after such transfer to redeem its stamps when presented in the manner specified in its contract.

The bill of complaint states "that said trading-stamp book contains a notice to the effect that the book and the stamps which are to be placed therein are the property" of the complainant, and "are not transferable without the permission" of the complainant. The sample trading-stamp book referred to in the bill and annexed to it as an exhibit contains a notice which may or may not exactly bear out the above-quoted allegation of the bill. This allegation of the bill, however, is entirely disproved. The defendant's affidavit has attached to it a trading-stamp book purporting to be one of the books of the complainant and apparently precisely the same in all respects as the sample referred to in the complainant's bill, excepting that it contains no notice whatever of the character above set forth—no notice

in addition to the "explanation" which all the books contain. The defendant in this affidavit testifies that the sample trading-stamp book of the complainant attached to the bill "is a new book recently printed," that the books of stamps which the public has received up to the time of the filing of the bill, or which the defendant has purchased, contain no such notice, but "are of the character shown by the sample annexed" to the defendant's affidavit. The complainant, although having abundant opportunity to answer this affidavit and to show precisely when the new trading-stamp books containing this notice were first published, refrained from doing so, and the only answer to the above-mentioned allegations of the defendant's affidavit is contained in an affidavit of one Frederick T. Parker, to the effect that on May 10th, 1904, which was eighteen days after the bill of complaint was filed, he purchased from the defendant two trading-stamp books filled with stamps, which books are annexed to his affidavit. These two trading-stamp books are not of the kind which the bill falsely represents as controlling or affecting in some way the status of the trading stamps which the defendant had been giving out as premiums, nor are they of the kind set forth in the affidavit of the defendant. They contain a notice in addition to the "explanation" which all the books contain, but this notice is in a material respect different from the notice contained in the sample trading-stamp book represented by the bill of complaint. It is proper to remark that the bill of complaint presents in a schedule not only the sample trading-stamp book above referred to, which seems to contain the final form of notice which the complainant has framed to meet the requirements of its business, but also a sample of the trading-stamp book of the kind which Mr. Parker procured from the defendant on May 10th, 1904. The fair inference, I think, is that the draughtsman of the complainant's bill did not intentionally make a misrepresentation, but was unconscious that there was any essential difference between the different editions of the trading-stamp books in respect of the notices which they contained. Counsel for the complainant has based no argument upon the notice incorrectly alleged in the

bill to have been given in the original trading-stamp book.
Such notice, published as set forth in the defendant's affidavit,
is entirely inoperative without regard to any effect it might
have if published to the world before the·trading stamps were
issued.　There is no evidence that a single contract has been
made, or a single stamp issued with reference to this new
notice.　The fact is established that the entire body of trading
stamps on the market, when the bill was filed, was issued under
contracts referring to a form of trading-stamp book which con-
tains no notice purporting to limit the transferability of either
stamps or books, or the rights which the stamps represent.
When the complainant comes before the court showing that its
obligations to deliver merchandise in exchange for these stamps
have been entered into with its subscribers and the public, after
such notice as it sets up in its bill has been duly given, the
effect of such notice may be considered.　The complainant had
no more power to issue this notice and thereby affect its fixed
liability upon its outstanding transferable obligations, than a
debtor has the power to limit his liability on his outstanding
negotiable paper by a similar notice.

The conclusion I think on this branch of the case, quite be-
yond all doubt or discussion, is that the complainant has made
its stamps, or rather its obligations, to deliver merchandise in
exchange for its stamps, generally assignable without limitation
of any kind whatever, excepting as to the mode in which the
stamps are to be presented for redemption.　The complainant
has not even undertaken to notify the public that it claimed the
slightest right to interfere with or control the holder for value
of its transferable obligations in selling, assigning or transfer-
ring the same.　If any limitation upon the power of the holder
of this transferable property to transfer the same is to be dis-
covered in the transaction, or series of transactions which result
in putting the property on the market, it must be by implica-
tion: an implied obligation or condition affecting all subse-
quent holders of this property must be discovered and enforced
by a court of equity.

5. We are now prepared to inquire what is the true nature
and definition of the legal or equitable right which the com-

plainant is asserting in this case and asking to have protected by an injunction. It does not help the inquiry very much to say that the defendant is injuring or even appropriating the complainant's business. A man's business may often be injured or appropriated, and yet he may have no remedy at law or in equity. The question is, what is the precise legal or equitable right of the complainant, when stripped of all misleading and indefinite phraseology, which the defendant is violating by giving out the complainant's trading stamps, which he has lawfully acquired from persons who have collected them in the regular way or their transferees, to his (the defendant's) customers as premiums for the advertisement and general promotion of his business.

The complainant's counsel argues that the defendant is fraudulently issuing or re-issuing these stamps, and that his customers who receive them are falsely led to believe that they are "collecting" them "in the regular way," when in fact such is not the case—when in fact the stamp represents no obligation which the complainant is bound to discharge. This argument applies with full force to the alleged conduct of the defendant in fraudulently obtaining pads of stamps from the subscribers of the complainant, in violation of their contracts, and giving out such stamps to his customers, which conduct is included within the restraining order and will be prohibited by the injunction which will issue in this cause, but has no application to the conduct of the defendant in buying up regularly-issued and collected stamps and 'transferring them to his customers as premiums. In this transaction the defendant is not fraudulently "issuing" or "re-issuing" the stamps, nor do his customers "collect" them within the meaning of the contract of the complainant with its subscribers. The defendant is merely assigning stamps which have theretofore been issued in the regular way. No one suggests that the defendant has not a right to advertise for and buy up as many stamps of the complainant as the lawful holders thereof are willing to sell to him. No one denies that the defendant may place these stamps in books and present them to the complainant to be exchanged for articles of merchandise, or give the books and stamps as Christmas pres-

ents to his children, or sell them for cash. The narrow claim is that while the defendant, as one of the general public, is invited to acquire these transferable obligations of the complainant, and again transfer the same in almost all ways in which he may see fit to transfer the same, he has no right to transfer them as premiums in his shop to his customers, or, in other words, sell them to his customers in the same manner in which they were originally issued and sold by the complainant's subscribers. I purposely use the word "sold," because when one of the complainant's subscribers sells an article for a dollar and gives out ten trading stamps, the transaction in effect consists in the transfer to the customer of certain merchandise then and there delivered and the transfer of an assignable order on the complainant for certain other merchandise. Both things are transferable property and both are paid for by the dollar.

It has not been argued that the defendant is guilty of unfair competition in representing to the public that he was advertised, or commended, or in some way certified to by the complainant. The evidence indicates that the public do not deal with merchants in reliance upon their connection with the complainant or its system. There is no proof that the mere right lawfully to give out the complainant's trading stamps in any way affects trade. There is no evidence that if a person does not wish to get trading stamps he will go to a subscriber of the complainant in preference to other dealers. The evidence shows that the public are attracted to the shops where they can get these valuable stamps, and have no concern with the relations of the shopkeeper to the complainant, provided valid stamps can be obtained. But the complete answer, I think, is that the proofs show that the defendant, in the most open and notorious way, is advertising his hostility to the complainant and boldly announcing his intention to buy up the regularly-issued stamps of the complainant and the regularly-issued stamps of other companies, and transfer them to his customers, without regard to the contracts under which these stamps have been issued. I find no support for any charge of unfair com-

petition, the essence of which in every case is fraud, simulation, deception. No one is deceived here.

As I analyze the complainant's case, the proposition upon which it necessarily must rest is this: that while the complainant may flood the market with its transferable obligations, enforceable by whomsoever they may be presented, nevertheless these obligations are not transferable for a purpose or with an effect which is injurious to the complainant's business, in which they were originally issued, and cannot be used in a manner detrimental to the trading-stamp scheme. In my opinion, this proposition is without a shadow of support in law or in equity. As I have said heretofore, the alleged equitable right of the complainant to dictate the manner in which the defendant shall transfer these transferable obligations of the complainant which the defendant has lawfully acquired must in some way be raised by implication. The complainant has not made the slightest effort, in its contracts or "explanation" upon which all its stamps were issued, to indicate that such a power of control was reserved. All these stamps have been put forth and large numbers of purchasers have been induced to expend their money for them without notice that they could not be transferred without limitation. To raise a limitation by implication now which will take the defendant out of the market and prevent the holders of the stamps from selling them to the defendant for cash, very directly impairs the value of the stamp or the property right which it represents.

The trading-stamp scheme is complex and is based upon a large number of legal and equitable principles relating to the law of personal property, the law of contracts, the law of estoppel. The scheme has been adjusted with care so as to gain the full advantage of the binding force of these principles of jurisprudence. One advantage to the complainant, as we have seen, results from the general assignability of the obligation which the trading stamp represents. But now a weak spot is developed by the operations of the defendant, and the rules of law and equity, which make this obligation of the complainant to give merchandise for stamps practically negotiable, are found to threaten very great damage to the complainant's system. In

my opinion, what the complainant is endeavoring to do in this suit is to have a court of equity modify these rules and give the party who puts trading stamps on the market the right to control the same whenever their use or transfer becomes injurious to his business. This claim, in my opinion, is based upon the fallacious notion that the trading-stamp scheme is *per se* a subject of care and protection by courts of equity.

Men who devise novel schemes of transacting business in order to make money cannot have the courts create novel rules of law for the protection of such schemes. When courts do things of this character it seems to me that they are traveling beyond even the borderland of the law of judicial decision, sound, proper, "judge-made law," and are invading the province of legislation. The legislature often does intervene for the protection of some new form of business and enact new rules of civil or criminal law for its protection. It is the province of the courts to administer and apply existing law. Whether the trading stamp, like the beer bottle, is entitled to receive special protection under our law, is a question for the legislature of the state to decide.

I can see no distinction between the status of this transferable obligation of the complainant after it has been put on the market and the status of a chattel issued or delivered in the same way. Suppose the defendant should obtain a large stock of merchandise which the complainant offers for the redemption of its stamps. The defendant might do this by continuing his purchases of the complainant's stamps and presenting them in books at the complainant's stores, or he might intercept persons who had exchanged stamps for merchandise and buy the merchandise from them for cash. In this way the defendant might possess himself of a duplicate stock of the complainant's premiums at a price far below what the complainant paid for the same articles. Now, suppose the defendant should offer by a system of stamps or otherwise these same articles as premiums to his customers, but at a rate far more favorable to the customer than the rate which the complainant's subscribers could offer. Such a method of business might greatly injure the complainant's business for a time at least, but it seems

beyond question that the complainant would be without remedy. The complainant cannot control the use to which chattels may be applied after it has parted with the title to such chattels. *Garst* v. *Hall & L. Co., 179 Mass. 588 (1901)*; *Appolinaris Co.* v. *Scherer, 27 Fed. Rep. 18 (1886)*; *Bobbs-Merrill Co.* v. *Snellenburg, 131 Fed. Rep. 530 (1904)*. See *55 L. R. A. 631,* note and cases cited.

Suppose, again, a merchant should offer certain unique articles, the production of which he controlled, as premiums to his customers. A competitor would have the right to collect a stock of these premiums from persons who had received them and give them out again to his customers as premiums. The original distributer of the articles could not complain because his competitor was giving them out at rates which he could meet only at great loss, and his original advertising scheme was being defeated by the very instruments which he had provided for its successful operation.

The only two respects wherein these transferable obligations of the complainant seem to differ from chattels distributed under a similar system, do not, to my mind, take them out of the operation of the well-settled general rule that one who transfers personal property cannot attach to such property conditions which in any way limit the power of subsequent owners to alienate the same. The retention by the complainant of the legal title to the paper which is the evidence of its transferable obligations, for reasons which I think I have sufficiently indicated, cannot affect in any way the property right of the holder of the complainant's obligation to deliver merchandise in exchange for the stamp. This property right is absolutely vested in the collector of the stamp and his assignees, and is as safely beyond the control of the complainant as a chattel which the complainant has sold.

The fact also that the complainant must do something, must receive the stamps and deliver the selected article in exchange therefor, seems to me to be immaterial to this present discussion. It may be conceded, for the purposes of this case, that the complainant has full power to impose all sorts of honest conditions upon its liability to exchange merchandise for its

stamps. The complainant has, in fact, imposed two most important limitations upon such liability relating to the mode in which the stamps shall be presented for redemption, and the validity of these limitations has not been questioned in this case. But when the transferable obligations represented by the stamps have been put on the market subject to certain specified conditions in respect of their discharge, the complainant can exercise no lawful control over them; the holder has a *fixed right* to have the complainant discharge the obligations when the specified conditions are complied with, and he is not obliged to notice any conditions which have not been specified, which do not enter into and modify the obligation of the complainant. Such holder owns what in a court of equity is practically equivalent to a negotiable warehouse receipt—practically the same thing as a chattel.

Whether under the contract of the complainant with its subscriber a chattel or a stamp representing the right to obtain a chattel is delivered to a customer, it must be conceded that the three parties to the transaction, the complainant, the subscriber and the customer, may all be bound with reference to the transfer or use of the chattel or stamp by any contract which they may see fit to make. But as the authorities above cited show when such personal property escapes from the control of the first party who took it under the contract, the contract cannot follow it, no condition created by the contract can attach to it, and the only remedy of either of the three parties who may be injured by the violation of the contract is in a suit on the contract against the party to such contract who was guilty of such violation. *Garst* v. *Hall & L. Co., supra; S. C., 55 L. R. A. 631,* note.

It should be observed that if upon any theory the customer who collects a trading stamp from a subscriber of the complainant is bound by some implied contract that he will not use the stamp thus acquired, or intentionally permit it to be used as an advertising premium—an admission now made merely for the purposes of this discussion—there is not the slightest evidence that the defendant is bound by any such contractual obligation. There is no evidence that the defendant is "collecting" stamps

by purchases from the complainant's subscribers. The evidence shows that the defendant is buying in the market stamps which have been regularly issued, the outstanding obligations of the complainant, and the complainant's scheme is so devised that even if the defendant might not lawfully purchase, for his special use in his store, stamps from the original collectors, it is impossible for him to discriminate when the stamps are offered to him between original collectors and subsequent transferees. But it is unnecessary to pursue an argument based upon a false premise. There is no implied obligation of a customer who purchases merchandise from one of the complainant's subscribers, and at the same time purchases a transferable order on the complainant for other merchandise to refrain from using the property which he has thus bought and paid for in a way which will injure either the complainant or its subscriber. The customer and the subscriber, the merchant, deal at arms'-length; there are no relations of confidence or common interest between them. The customer pays his money and gets his goods, and if he is to be limited in his power to control the property which he has purchased, such limitation must be expressed in a contract which he is required to enter into with the merchant in order to get the goods. The theory of an implied contract binding the customer to refrain from using the property which he has bought in such a manner as to injure the trading-stamp scheme, is, in my judgment, entirely untenable.

Counsel for the complainant cite but a single authority directly sustaining their contention on this motion, but the case so cited is apparently on all fours with the present case, and if followed would compel the extension of the injunction in accordance with the complainant's insistment. The case is *Sperry & Hutchinson Co.* v. *Mechanics Clothing Co.*, decided November 29th, 1904, by the circuit court of the United States for the district of Rhode Island, and as yet not reported [*135 Fed. Rep. 833*]. The case is also reported in the same court on motion for a preliminary injunction in *128 Fed. Rep. 800*, and again in the same volume at page 1015, on motion to modify the preliminary injunction. In deciding these preliminary motions the learned judge of the Rhode Island federal court seemed to incline to

the opinion that the trader with one of the complainant's subscribers who received a trading stamp was a holder for value of a right which he could transfer, and that this right could be transferred by a merchant to his customers as a premium precisely as goods or car tickets can be so transferred, but reserved the consideration of the question for the final hearing. Although this case had not been published, and was not brought to my attention at the time when I advised the preliminary restraining order, precisely the same tentative opinion which the Rhode Island federal court indicated caused me to make the exception from the operation of the restraining order which has been the subject-matter of the entire argument in this case. The Rhode Island federal court, apparently yielding very largely to the authority of the case of *National Telegraph News Co.* v. *Western Union Telegraph Co., 119 Fed. Rep. 294,* found that the difficulty which it had formerly perceived in the way of the complainant's case disappeared "upon a fuller consideration." This difficulty, in my mind, has become insurmountable, for reasons which I have endeavored to set forth, so that I find myself unable to take the convenient course of disposing of a complex and troublesome question by following the positive ruling of a court of another jurisdiction.

In the opinion on the final hearing of the above-cited case, which has been submitted by counsel for the complainant in a printed pamphlet, the general assignability of the trading stamp or the right of redemption which it represents seems to be distinctly admitted. The tort of the defendant, to restrain which the injunction was granted, consisted in its using these trading stamps as a means of commending and advertising and increasing its business, precisely as the subscribers of the complainant had used the same stamps when they first issued them. All through the opinion a right seems to be conceded to the complainant to interfere with the transfer of these assignable stamps when transferred for a purpose or in a manner inimical to the trading-stamp "scheme or plan" of business. As I have endeavored to explain, I cannot avoid the conclusion that when a man frames a scheme or plan of business he is obliged to frame it with reference to existing laws which govern the own-

ership and transfer of property. If his scheme ignores a well-settled rule it is liable to fail, and I know of no power in the courts either to abolish or to enact a rule of law in order to save such scheme from failure.

The reasoning of the learned court in this case seems to be based upon the assumption that the *intention* of the parties to the original trading-stamp transaction is something which the courts ought to effectuate and which outside parties should not disregard or defeat. It is difficult to see how precisely the same reasoning does not apply with equal force to prevent the collection and so-called reissue of premiums which one merchant has given out in his business by a competitor when such premiums, instead of being transferable obligations, are chattels.

"We may assume," the opinion reads (*p. 2*), "that the defendants have the right to purchase trading stamps from collectors who have acquired them from authorized merchants, and as the assignees of the collector's rights to present them for redemption. Does it follow that they may reissue them anew as cash discounts or as premiums for cash purchases, according to the general method of merchants authorized by the company to issue such stamps?"

Why not, if the so-called reissue is not a fraudulent simulation of an original issue under a contract, but an honest assignment of a transferable obligation of the trading-stamp company which the assignor has lawfully purchased for value? Back of this whole argument lies the implication that the trading-stamp "scheme or plan" is something sacred, or at least something which *per se* courts must protect. The truth, I think, is that there is no presumption that any particular "scheme or plan" of business, although confessedly lawful, is necessary or even specially advantageous to the growth of commerce and the advance of civilization. All schemes and plans—and in these days schemes and plans are numerous and complex—have to be subjected to the test which is applied when they are set in operation in the face of opposition and competition under existing rules of law.

In another place (*p. 4*) the opinion notes the fact that persons like the defendant in this case, "as transferees of the

rights of persons who do not acquire these stamps for advertising purposes, secure for themselves the ability to do what it was not *intended* that a collector of the stamps should do." Here again we have the original *intention* of the person who has put the chattel or the chose in action on the market taken into consideration in determining how a future absolute owner of the chattel or chose in action shall use or transfer the same.

Further on the court puts this question: "But it is asked why, if the right of the customer to transfer it (the trading stamp) is conceded, may he not transfer it in any mode he pleases, and give it as an advertisement if he sees fit?" I cannot think that the court has presented any satisfactory answer to its own most aptly expressed test question. The answer seems to involve the notion that the "trading-stamp scheme is a three-cornered transaction in which the rights of the three parties are involved," *i. e.,* the rights of the complainant, its subscribers, and the collectors of stamps and their assigns, and that all these three parties are in some way bound to support the scheme. I am unable to perceive how the defendant, who has purchased on the market the transferable orders for merchandise which the complainant has seen fit to issue in pursuance of its scheme, has been in any way brought into that scheme or has become obligated in any way to concern himself about such scheme.

The learned judge concludes his discussion by accepting as true the following statement from the complainant's brief:

"When once given out by a merchant they (the stamps) have served the advertising purpose for which they were *intended,* and to permit the collector of the stamps to again advertise with them would be to go beyond what was the clear *intention* of the parties, and would be destructive of the rights of the complainant."

I am unable to accept this proposition, or, indeed, to discover in it anything pertinent to the present investigation leaving out of view the manifest *petitio principii* contained in the last clause. Without commenting on the fact that the defendant is not the "collector" of the stamps, but stands before the court as the purchaser in the open market of property rights which

are generally transferable, it may be conceded that what this defendant is doing is far "beyond what was the clear intention" of the complainant and its subscribers when its scheme or plan was set in operation and the market was flooded with these transferable obligations; but, as I have endeavored to show, the intention of the parties who transact business for their profit, in which one of them parts with transferable personal property, in regard to the manner in which future owners of such property shall use it, or the purposes for which they shall transfer it, is a matter with which neither courts of law nor courts of equity have any concern. A man cannot retain control of personal property which he has tranferred after it gets out of the hands of the parties to the contract under which it is transferred, merely because without such control a subsequent owner may use it to the injury or even the destruction of the original owner's business. This, it seems to me, is precisely what the complainant in this case claims the right to do and what it was allowed to do in this interesting case in the Rhode Island federal court. I incline to think that much of the reasoning of this carefully considered case would apply to the case of a manufacturer of a valuable and unique article, whose business is made less profitable by the action of a second-hand dealer who widely advertises that he will purchase this manufactured article and sell the same at a great discount upon the original cost. Such competition in his own goods may be beyond the manufacturer's intention, the intention with which he makes his original sales.

The case of *National Telegraph News Co.* v. *Western Union Telegraph Co., supra,* which seems to have very largely influenced the final decision of the subsequent Rhode Island case, was decided by the United States circuit court of appeals in Illinois, and the opinion of the court was delivered by Judge Grosscup. It is a novel and interesting case. The court admits that there was no precedent for its action, and boldly proceeds to make a precedent to meet the requirements of a situation involving not only hardship to the complainant but a menace to most important interests of mankind. The facts are as follows: The Western Union Telegraph Company had a system of

"tickers" throughout Chicago located in brokers' offices, hotels, saloons and other more or less public places, for furnishing prompt reports of stock quotations, horse races, athletic games, &c., the news being printed upon strips of paper "open to the inspection of all persons who came within these places." In this manner this class of news was simultaneously published without reservation at each one of these "tickers" and all persons were invited to read the news on the tape as it was ticked off. The collection of this news was expensive, and presumably the Western Union Telegraph Company made substantial profits by furnishing it by its "tickers" at many different points at the same time. The report does not indicate that the customers of the telegraph company, on whose premises these "tickers" were placed, made any contract which in the slightest degree limited the publication of the news by these "tickers." The telegraph company had not even attempted, by a notice to its subscribers or to the public, to limit the dedication to the public which it made by this unreserved publication. All the world was invited to frequent these places and get the information which was printed on the tape, and presumably to act on such information, and to further disseminate the same by letters, by telegraph, by telephone and otherwise. No question probably would ever have arisen as to the right of all men to communicate the information which was thus derived from these tickers as they might see fit, if it had not been for the operations of the defendant, the National Telegraph News Company, which were the subject of investigation in this suit. This news company established a system of tickers similar to the complainant's in various places in Chicago, and proceeded to redistribute to their subscribers by means of these tickers the news which the complainant had collected at great expense and distributed and published in manner aforesaid. This redistribution was effected with the loss of a few moments only, so that practically the defendant was competing with the complainant in the distribution of news, while the news so distributed was collected and paid for by the complainant alone. There was no claim that any persons were deceived or misled by the way in which the defendant carried on its business. It was not charged that any

person was led to believe that he was obtaining at the tickers of the defendant the direct service of the complainant. The essential element of the tort which courts of equity suppress by injunction, and which is commonly called unfair competition, is conspicuously absent in this case, and the decision of the court is not placed upon the ground that the defendant was practicing a deception upon the public which was injurious to the complainant's business. I think it must be assumed from the opinion of the court in this case that if the competitive distribution of the complainant's news by the defendant had been accomplished by messengers or megaphones, or telephones, or by a system of wireless telegraphy, and the news had been posted on blackboards by the patrons of the defendant, the principles applied to the case would have been exactly the same. The problem was to discover how, without the aid of legislation, the court could lay down a rule limiting the right of one of the general public to disseminate news which had once been published to the world without limitation, in any way in which he might see fit to disseminate the same. No objection would have been made to the defendant's method of operation if it had waited long enough before setting its tickers in operation to prevent the distribution of news thereby affected from being competitive.

The learned court sustained the order of the circuit court, which enjoined the defendant from copying and publishing the news in manner aforesaid "until the lapse of fully *sixty minutes* from the time such news items" were printed by the complainant's tickers. The learned court finding the existing rules of law and equity which up to that time had been recognized by the courts to be inadequate to protect the complainant's business, with great frankness proceeded to make a precedent that would accomplish the desired object, and, as it declared, "to start this precedent upon a career."

The gist of the decision seems to lie in the proposition that even without any attempted limitation by contract or notice upon the publication of news at the tickers the law will raise and enforce an implied limitation which will prevent a gratuitous recipient of such news from republishing the same *in com-*

*petition* with the business in which the same has been collected and published.

A wide gulf divides this case from that of a person who is invited to buy goods and trading stamps, and after buying both these things is informed that while he may use the goods as he pleases he must not use the stamps or the transferable obligations which they represent in a manner which will injure *the scheme* of the trading stamp company—that, in effect, by his purchase of this peculiar species of property upon an unlimited offer, he has in some strange way been brought against his will into the trading-stamp scheme so as to be charged with some duty relating to the protection of that scheme.

A still wider gulf divides this "ticker" case from the case presented here, where the defendant is not a "collector" of trading stamps, but is purchasing them on the market where they have been floated in large quantities by the complainant, and where, according to the complainant's own scheme of business, they pass from hand to hand.

It is unnecessary for me either to criticise or approve the action of the Illinois federal court in this unique case. In the eloquent closing passages of the opinion the court plainly discloses that the business for the protection of which the court made a new precedent and started such precedent on its career, was not that of purveying stock quotations and accounts of baseball matches and prize fights to the brokers' offices and saloons of Chicago. In some way not explained this able court found that the controversy before it involved the interests of the telegraph system of the world. I think I ought to be extremely cautious in extending under a different state of facts the scope of a novel precedent established for safe-guarding one of the most efficient instrumentalities of civilization to the protection from injury or even to the salvation of the "scheme or plan" of a trading-stamp company. I am unable to perceive that any broad interests of civilization are involved in the trading-stamp scheme, and therefore feel constrained to apply to it the established principles of the law of contracts and the law of torts as recognized and enforced in the remedial system of courts of equity.

The principles acted upon in the injunction suits brought by railroad companies to restrain "scalpers" from collecting the unused portions of their non-transferable tickets and transferring them to persons who fraudulently use them as vouchers of their right to transportation, which counsel for the complainant urges upon the attention of this court, have no bearing whatever upon the question under discussion in this case. As the argument for the complainant points out, the railroad companies have a right to make their tickets non-transferable, and this right is recognized and enforced in these injunction suits. If a railroad company should undertake to make the unused portions of its tickets generally transferable, and establish the practice of honoring them by whomsoever they might be presented on its cars, and then should file a bill to restrain a "scalper" from collecting and selling these unused portions of tickets, and thus aiding their distribution to the injury of the complainant's business at its ticket offices, a case would be presented more nearly parallel with the one with which we are now dealing. No case has been cited where any injunction has been issued in aid of the business of a railroad company which presented the supposed state of facts above set forth.

6. Let it be conceded that the views adverse to the complainant's alleged rights hereinbefore set forth may not ultimately prevail in this state—that the doctrine laid down, after careful consideration, by the Rhode Island federal court may be adopted by our court of errors and appeals, and that the views herein set forth may be rejected—it still remains true that the complainant stands in this court resting his cause upon a rule of law which to-day is unsettled and doubtful. It is hardly necessary to cite the cases which establish the proposition that in such a case a preliminary injunction cannot be issued by the court of chancery. *Citizens' Coach Co.* v. *Camden Horse Railroad Co.,* 29 *N. J. Eq.* (*2 Stew.*) 299; *Hagerty* v. *Lee,* 45 *N. J. Eq.* (*18 Stew.*) 255; *Pennsylvania Railroad Co.* v. *National Docks Railway Co.,* 53 *N. J. Eq.* (*8 Dick.*) 178, 193.

In the case of *Delaware, Lackawanna and Western Railroad Co.* v. *Central Stockyard Co.,* 43 *N. J. Eq.* (*16 Stew.*) 75, Vice-Chancellor Van Fleet, referring to the above-mentioned rule, de-

19

clares that it is jurisdictional, and that "it stands as a limitation upon the power of the court, and is therefore a law unto the court which the court must respect and obey."

It is useless to discuss the origin, history or the propriety of this hard and fast rule, or to point out instances in which it has been disregarded without objection. Whatever the legislature or the court of errors and appeals may do in these modern days in the way of abolishing or modifying this rigid rule, which to some minds may seem to be inconsistent with approved modern methods of legal procedure, the rule cannot be disregarded or evaded by this court.

The only question, therefore, to be answered in determining the applicability of the rule to the present case is whether the primary right of the complainant, for the protection of which he asks for a preliminary injunction, is legal rather than equitable in its character. Of course, the rule under consideration does not interfere with the settlement of equitable principles which have been uncertain and doubtful in injunction suits, and in such suits undoubtedly preliminary injunctions may go. The whole law of unfair competition, which is largely of recent development, has been established in suits in the court of chancery, in many of which preliminary injunctions have been issued.

I think it is quite plain that the fundamental right which the complainant is asserting in this cause, if such right exists, is strictly a legal right which courts of law will enforce in an action for damages, and which a court of equity, under our present system, can only enforce under special circumstances, where, for instance, such court takes jurisdiction to prevent multiplicity of suits, or because the ascertainment of damages is difficult—where, in brief, the remedy at law is inadequate. If the defendant is guilty of any tort it is because he is openly, under a claim of right, violating the property rights of the complainant by committing a delict which is classifiable generally as a trespass, but in which there is no element of fraud. A court of common law would take cognizance of this alleged tort, if it be one, in the old action *ex delicto* of trespass on the case.

But let us suppose that I am in error, as I should be glad to have proved to be the case, in assuming that at the present time

in this court the rule of procedure under consideration is without exception. Let us take, for instance, a case in which the complainant's legal right is doubtful and unsettled, which, however, would call for a preliminary injunction as a matter of course if this legal right were clear. Now, let us suppose that in such case, if the property, in respect of which the complainant's doubtful legal right is asserted, is threatened with complete destruction and the defendant is pecuniarily irresponsible so that the complainant's legal remedy is not only inadequate, but of no possible value, a preliminary injunction may issue out of this court, at least when such injunction can do the defendant no harm, in order to preserve the property until the complainant's right can be ascertained and settled either in this court and afterwards in the court of errors and appeals, or by an appropriate action in a court of law. With any such supposition, what possible foundation for any exception to the established rule is suggested in this case? It is not alleged that the defendant is not fully responsible for any amount of damages which the complainant could possibly recover against him in an action at law. While the defendant's operations may cause damage to the complainant in its business, there is nothing to justify the apprehension that such damage will be permanent or so extensive during the period which will be required for the ascertainment at law of the complainant's right as to make the complainant's compensatory recovery at law, in case he secures one, in any degree inadequate. The fact that the damages of the complainant may be difficult of ascertainment, and the fact that the defendant's conduct, if illegal, amounts to a continuous violation of the complainant's rights, are not circumstances which can be recognized in this court, as the law stands to-day, as taking the case out of the operation of the well-settled general rule.

The injunction upon the defendant will be subject to the exception contained in the restraining order.