The Master.
The New Jersey Railroad and Transportation Company, by their charter, March 7th, 1832, were authorized to construct their road from New Brunswick to some convenient point on the Hudson river opposite the city of New York, also to purchase the turnpike roads and bridges on the route of their railroad, and all or any of the stock of such companies, and to construct such bridges over the Passaic and Hackensack, with the consent of the Bridge Company, as might be necessary for the enjoying the privileges of the act of incorporation.
November 21st, 1832. The New Jersey Railroad Company agreed with the proprietors of the bridges over the rivers Passaic and Hackensack to buy the stock of such of the stockholders of the latter company as desired to sell at $150 per share, and were permitted to construct a passage way over said rivers, either along side of or over .said bridges, so as not to interrupt the travel over the same. *173 Of the 1000 shares of stock of the Bridge Company, 932 were purchased hy the New Jersey Bailroad Company, and ton more are hold, by several individuals, in trust for the Bailroad Company.
Bridges were constructed, in pursuance of said agreement, over the Passaic and Hackensack, and have been used to the present time by the Bailroad Company for the purposes of their road.
The Morris and Essex Bailroad, which terminates at Newark, connects, also, at that place with the New Jersey Bailroad, and thence the company’s trains of cars pass over the latter road to Jersey City.
March 26th, 1852. The Bloomfield Bailroad was chartered, and, by a supplement, passed February 4th, 1853, they were authorized to construct a bridge over the Passaic river, and connect with a branch with the New Jersey Bailroad, by agreement with the latter company. The New Jersey Bailroad Company were also, by the same supplement, authorized to build such bridge and branch road, the river to be crossed at a point not less than 200 yards above the turnpike bridge on said river.
October 13th, 1853. The New Jersey Bailroad Company agreed with the Morris and Essex Bailroad to build, with the consent of the Bridge Company, a bridge over the Passaic river, at the foot of Division street, and a branch road connecting with their main road, so that the trains of the Morris and Essex Bailroad could pass with their locomotives, without detaching them as heretofore, and passing through Newark with horses to the New Jersey Bailroad junction.
December 30th, 1853. The Bridge Company, at a meeting for that purpose, gave their consent to the New Jersey Bailroad Company to build the bridge in question by a vote of all the stockholders present at the meeting. The complainant, who is a stockholder in the Bridge Company ijtod the owner of ten shares of stock, having mistaken the hour of the meeting, did not reach the place of meet *174 ing until after the adjournment, and offered a written protest against the proceedings of the meeting, which was not received, on the ground that the meeting had adjourned.
The complainant files his bill for an injunction to restrain the New Jersey Eailroad from building the bridge, on the ground, that it will impair his vested rights, as a stockholder in the Bridge Company, and depreciate his stock.
It is a bill filed by a single stockholder, dissenting from the act of a majority of the corporation. •
It is well settled, “ that a court of equity will interfere on behalf of a single stockholder, if he can show that the corporation are employing their statutory powers, funds, &c., for the accomplishment of purposes not within the scope of their institution, and an injunction in such cases will be granted.” Grant on Corporations 290; Ward v. Society of Attorneys, 1 Coll. 370.
It is equally well settled, “ that acting within the scope and in obedience to the provisions of the constitution of the corporation, the will of the majority, duly expressed at a legally constituted assembly, must govern.” Ib. 73.
The legislature may give additional powers, from time to time, to corporations, and acts of the corporation, in pursuance of such authority, are binding, unless they conflict with the vested rights or impair the obligation of contracts, according to the provision of statutes or the constitution of state.
By the supplement to the charter of the Newark and Bloomfield Eailroad Company, passed March 26th, 1852, § 3, it is enacted, that nothing in this supplement shall be. so construed as to impair, in any manner, any reversionary interest or vested right which the state, or any incorporated company or companies, or any individual, may possess under the charter of the Bridge Company. This provision is also, in effect, contained in the article of the constitution restraining the legislature from passing any act impairing the obligation of contracts.
*175 "What are the vested rights of a stockholder of the Bridge Company ? They are, in regard to this question and the value of his stock and interest in the franchise of exclusive tolls, and, as ancillary to this, an interest in the exclusive right of building bridges over the rivers Passaic and Hackensack. Any act of the incorporation impairing these rights of a stockholder without his consent, either express or implied, would not be binding on him under the above provisions, except in a proceeding authorizing the taking of private property for public uses upon making compensation.
The main question to be considered is, whether the vote of a majority of the stockholders of the Bridge Company is sufficient to consent to the construction of the bridge under the agreement of the New Jersey Railroad Company with the Morris and Essex Railroad Company.
In pursuance of the agreement of the New Jersey Railroad Company with the Bridge Company, in 1832, most of the stockholders of the Bridge -Company sold out their shares to the former company at an advance of fifty percent. on the par value of their stock, or exchanged, at the above valuation, for stock in the New Jersey Railroad Company at par, thus choosing to embark in the new enterprise, and the two companies became united in interest, with the exception of the holders of a few shares of the Bridge Company, who declined to sell. Bridges were built over the Passaic and Hackensack for the accommodation of the railroad track without any apparent opposition, and this privilege has been enjoyed to the present time, a period of over trventv years. The complainant must be considered as having consented to this agreement; he purchased five of his shares from "William Wright, August 3d, 1833, the remaining five from the executors of Andrew Bell, December 2d, 1844. The answer states that William Wright had signed the foregoing agreement, and that the shares purchased of the executors of Andrew Bell were assigned subject to the agree *176 rnent. Although these conditions were questioned by the complainant at the hearing, yet his long acquiescence must be considered as equivalent to a consent on his part. Whatever ground of equity an individual stockholder may have had at the time of the agreement, a counter equity has arisen from lapse of time and acquiescence. A much shorter period of acquiescence has been held to suffice. Graham v. The Birkenhead Co., 2 Macn. & Gor. R. 146.
This power of the Bridge Company to make such an arrangement with the New Jersey Railroad Company, although originally beyond the scope of their corporate powers, became, with the consent of the legislature and the company, a new subject matter of the institution, with all necessary powers to carry into effect, enforce, and secure the provisions of their agreement with the New Jersey Railroad Company.
Is not the agreement of the Bridge Company, to permit the New Jersey Railroad Company to build the bridge in question, a modification of the original agreement, become necessary from the increasing business of the Railroad Company, and the convenience of the public in avoiding the delay from the interruption of the use of steam power, an arrangement carrying out the provisions of the original agreement with greater effect and precision, and within the scope of the additional powers of the Bridge Company ? The same amount of transportation will be divided between the two bridges, instead of going over one. The object of the exclusive right to build bridges, granted by the charter of the Bridge Company, was to prevent the construction of bridges interfering with the franchise of taking tolls. The contemplated arrangement will not affect the franchise. It is said that foot passengers will go over the new bridge, and thus evade the tolls. The same objection may be made to the present railroad bridge. Such a privilege is, however, no part of the agreement of the Bridge Company, and any *177 serious interference in that respect tending to impair the rights of a stockholder might be made a distinct ground of relief. In this view of the case, the consent of a majority of the stockholders of the Bridge Company is binding on the minority.
It was objected, on the part of the complainant, that the supplement to the Newark and Bloomfield Bailroad Company was unconstitutional, inasmuch as it contravenes the article of the constitution of this state which declares that every law shall embrace hut one object, and that shall be expressed in the title. The design of this provision is declared to be, to prevent improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other. The objects in that statute, however, are parts of the same enterprise, and cannot be said to have any improper relation to each other.
It is also urged, that the New Jersey Bailroad Company have no right to build this bridge under the Bloomfield charter, as the time for constructing this road has expired, according to the terms of the original act, and the supplement extending the time is, through mistake or oversight, defective in a significant word, and no effect can be given to it. If this be so, it does not affect the consent of the Bridge Company, which was obtained ■within the limited time.
But the objection, that the New Jersey Bailroad Company has no right to build this bridge under this act and other acts alleged to be inoperative or unconstitutional, cannot be considered, in a proceeding of this kind, any usurpation in this respect, is a proper case for the attorney general in an information filed on behalf of the state.