On or about April 1st, 1922, the owners and operators of buses operating between Veterans' Square or Journal Square, Jersey City, New Jersey, and the city of Bayonne, organized an unincorporated association known and designated as the South Hudson County Boulevard Bus Owners Association. The membership consisted of sixty-seven of such owners and operators. They then adopted a "constitution and rules." There are seventeen articles in the constitution of which article 1, entitled, "Name," reads as follows:
"The name of the organization shall be the South Hudson County Boulevard Bus Owners' Association."
Article 2 entitled "Purposes," reads as follows:
"Shall be to control the operation of; and the revenue arising from the operation of the buses on the South Hudson County Boulevard."
Article 3 entitled "Membership":
"Any person who is a permit holder or is the rightful owner of a bus can be a member of this organization, as determined by the Association."
Article 4 relates to voting; article 5 to meetings; article 6 to officers and powers, as follows:
"The following officers shall be elected for a period of three (3) years; President, Vice-President, Secretary, Treasurer, Sergeant-at-Arms, Supervisor and Trustees. These officers shall be of the Pool and Association as one."
Article 7 is entitled "President;" article 8 is entitled "Vice-President;" article 9 is entitled "Secretary;" article 10 is *Page 33 
entitled "Treasurer;" article 11, "Sergeant-at-Arms;" article 12, "Supervisor;" article 13 is entitled "Board of Trustees," and reads as follows:
"Shall consist of sixteen members composed of the six elective officers and ten other elective members of the Association. This board shall carry on all the work and business of the Pool and Association.
"Duties of Board: To meet every Thursday night at 8:00 P.M. topass upon all bills, to let out and receive contracts, to act in advisory capacity with regards to duties of Supervisor, and tohave full charge of all business pertaining to the transactionsof the Pool and Association. The salaries of all employes to be under jurisdiction of this board.
"Seven members shall constitute a quorum. In the event of an office becoming vacant through dismissal, resignation or death, the board shall elect a temporary official for that vacancy until the next regular or special meeting, when the Association at large shall elect a permanent official for that position."
Article 14 is entitled "Grievance Board," and reads as follows:
"Shall consist of five (5) members and be appointed by the President. The President shall have the power to remove any member or members.
"Duties of Board: To sit every Thursday at 3:00 P.M. sharp, to hear all complaints against owners or drivers who have violated Association or Pool regulations, and to penalize accordingly. The decisions of the board are final and they can impose any penalty they see fit. The board shall have the privilege of granting an appeal or a rehearing in any case."
Article 15 is entitled "Order of Meeting;" article 16 is entitled "Recall of Officers;" and article 17 reads as follows:
"The constitution may be amended or modified by a two-third vote at any Trustees or Association meeting."
The constitution is in evidence as Exhibit C-4, and is in pamphlet form. Attached to and a part of the same pamphlet isExhibit C-5 which are the rules hereinbefore mentioned. The above constitution and rules are referred to in the testimony as the "old constitution and rules."
In 1930 the above constitution was amended, but no action was taken to change or modify the said rules. In its amended *Page 34 
form, it is entitled "Constitution and By-laws of the South Hudson County Boulevard Bus Owners Association;" it is in evidence as Exhibit C-6. The preamble of the constitution,Exhibit C-6, reads as follows:
"We, the South Hudson County Boulevard Bus Owners' Association, operators of omnibuses running south on Hudson County Boulevard from Journal Square to Bayonne, in order to render to the public safe and efficient and modern transportation, and further by this Association, to establish and cement a firm, co-operative and beneficial spirit among the owners of the said omnibuses, and in order to form a more perfect union, do hereby ordain and establish the following as our Constitution and By-Laws."
This last exhibit, C-6, consists of articles 1 to 20, inclusive. There is no mention made in any of these articles about "by-laws." The word "by-laws" appears only in the above recited preamble. There is no mention in the said constitution,Exhibit C-6, of any definite route, or line, or operation, of omnibuses excepting that which is expressed in the quoted preamble. The 1922 constitution of the association, ExhibitC-4, contained a provision for the amendment thereof; but the rules adopted with the said constitution, which are in evidence as C-5, contain no provision for amending, adding to or changing the old rules beyond that expressed in rule 33 of said exhibit which reads as follows: "Any addition or change to the above rules shall be strictly adhered to by the members."
The complainants allege that they are members of the defendant association, either in an individual capacity as owners, and, subsequently, in their corporate capacity, from the time the association was organized; that the members of the association in accordance with the rules and regulations thereof, agreed to operate their buses south on Hudson County Boulevard (between Veterans' Square, or Journal Square, in the city of Jersey City, New Jersey, and Second street in the city of Bayonne, New Jersey), and that the proceeds derived from this operation should be pooled by the members of the association, and after the payment of expenses, was to be distributed each week pro rata
among all the members of the association. The complainants further allege that *Page 35 
the "trustees and officers of the defendant association in violation of their duties to the membership in general, and for the purpose of obtaining unlawful gains from the said association, entered into an agreement with the defendants to operate their buses between Bayonne, Jersey City and New York City;" that the interstate operation of the buses, as aforesaid, is contrary to the constitution and by-laws of the association; that the interstate operation is conducted at a loss; that the sum of $15,000 was paid out of the moneys derived from the receipts pooled by the members of the association, in consequence of which the complainants were deprived of the benefits of the receipts which ordinarily would go into the association if the defendants operated their buses in accordance with the constitution and by-laws.
Upon application of the complainants, Vice-Chancellor Fallon issued a preliminary restraint enjoining the defendants from the interstate operation of buses.
Prior to April, 1933, there had been running on the Hudson County Boulevard two interstate bus lines, to wit, the Indian Coach Lines, Incorporated, and the Boulevard Transit Lines, Incorporated; they ran from Bayonne, through Jersey City, and into the city and State of New York. The competition between these two lines culminated in chancery litigation, instituted by the Indian Coach Lines, Incorporated, to restrain the Boulevard Transit Lines, Incorporated, from operating to New York. The differences between the two lines were subsequently adjusted, after which the Indian Coach Lines withdrew its operation on the Hudson County Boulevard. Some of the stockholders of the Indian Coach Lines were stockholders of the Boulevard Transit Lines, and some of them were also members of the South Hudson County Boulevard Bus Owners Association. Two of the complainants herein, Drogin and Posnak, were members of the Indian Coach Lines, and they are, or were, officials in the Boulevard Transit Lines. In fact, four of these complainants are members of the Boulevard Transit Lines. The said Boulevard Transit Line is a competitor of the defendant association. It operates over the same Hudson County *Page 36 
Boulevard route between Bayonne, Jersey City, and the city of New York.
In April, 1933, the defendant association's income from its so-called South Hudson Boulevard operations, was reduced, and it appeared to be seriously affected by the competition of the Boulevard Transit Lines, Incorporated. The question was presented to the members of the defendant association and a vote was taken, and a majority of the members decided to continue, and to extend, the line of bus operation to New York City; and designated ten buses to operate between New York and Jersey City. The number of buses in such service, because of demand, was later increased to fifteen buses. It may be here mentioned that the complainant Posnak, on behalf of the defendant association, helped to secure a New York terminal for the defendant association's buses. While the complainants in their bill allege that the New York extension was unprofitable, and a burden upon the members of the association, the evidence does not sustain them. The books and records of the defendant association disprove their contention. The weekly income or gross revenue of the defendant association, after deducting expenses therefrom, was divided by sixty-seven, the number of buses in the association, and distributed to the owners. When the gross income of the buses exceeded the dividend, the bus or buses having the excess pays the same into the association. Out of such "overs" the expenses of the association were paid after which the balance is paid to the bus owners who were "under" the pool allowance. The result being that all buses retained (page 524 of testimony) the same amount. It would appear from this that the buses do not pay into the association their "pool allowance" or "pool," but only that part of the revenue known as "overs." The testimony of one of the complainants (page 262 of testimony) states the "pool" is a paper figure.
Did the complainants suffer a loss because of the New York operation? The evidence shows that the gross revenue from local operation for the fifteen weeks preceding the combined local and New York operations to be as follows: *Page 37 
 Week Gross Local Weekly
 Ended Revenue Allowance
 Jan. 7, 1933 .............. $13,670.90 $196.00
 14, .............. 13,568.75 196.00
 21, .............. 13,482.25 196.00
 28, .............. 13,352.30 196.00
 Feb. 4, .............. 13,468.90 196.00
 11, .............. 13,352.40 196.00
 18, .............. 13,306.10 196.00
 25, .............. 12,875.70 196.00
 Mar. 4, .............. 12,969.00 196.00
 11, .............. 12,335.85 196.00
 18, .............. 12,526.75 196.00
 25, .............. 12,108.30 180.00
 Apr. 1, .............. 12,346.55 180.00
 8, .............. 12,624.95 180.00
 15, .............. 12,029.45 180.00
 ___________
 $194,028.15

These figures indicate a decline of the weekly allowance from $196 per week per bus to $180.
The combined gross weekly revenue from the local and New York operations for the continuing fifteen weeks is as follows:
 Week Gross Local Gross New York
 Ending Revenue Revenue Total
Apr. 22, 1933 .......... $11,957.05 $2,459.45 $14,416.50
 29, .......... 12,071.95 2,183.30 14,255.25
May. 6, .......... 11,915.55 2,466.45 14,382.00
 13, .......... 11,795.25 2,433.80 14,229.05
 20, .......... 11,626.75 2,284.60 13,911.35
 27, .......... 11,782.25 2,288.35 14,070.60
June 3, .......... 10,899.45 2,543.80 13,443.25
 10, .......... 11,436.30 2,614.25 14,050.55
 17, .......... 11,415.25 2,881.05 14,296.30
 24, .......... 11,200.15 3,601.25 14,801.40
July 1, .......... 10,768.90 3,425.00 14,193.90
 8, .......... 9,647.85 3,504.95 13,152.80
 15, .......... 9,882.20 3,440.25 13,322.45
 22, .......... 9,406.05 3,411.25 12,817.30
 29, .......... 9,382.10 2,910.80 12,292.90
 ___________ __________ ___________
 $165,187.05 $42,448.55 $207,635.60

It will be observed that the gross weekly revenue, from local operations, continued to decline as shown by the first *Page 38 
above set of figures. The gross weekly revenue from New York operations shows a continued increase. It is to be noted that the gain in gross revenue for the above fifteen weeks from the New York operation amounts to $42,448.55 which is approximately twenty-five and sixty-nine one-hundredths per cent. of the total.
The profit and loss result by periods of four to five weeks, according to the financial statements of the association, appears to be as follows:
January 1 to January 28 ................... $1,272.70
January 29 to February 25 ................. 112.38
February 26 to April 1 .................... 2,122.63
 _________ 737.55
April 2 to April 29 ....................... 149.77
April 30 to May 27 ........................ 685.23
May 28 to July 1 .......................... 827.02
July 2 to July 29 ......................... 4,118.96
 _________ 4,126.94
 ________
 4,864.49

This last statement shows a loss from local operations of $737.55 for the periods prior to commencement of New York operations, and the period of the combined New York and local operations shows a loss of $4,126.94, or a total combined loss for the year of $4,864.49.
 1 2 3 4
 Week Gross Revenue Average Weekly Net Gross Average Weekly
Ending of Local Line Expenses of Revenue Allowance 67
 Association Buses
Apr. 22 ....... $11,957.05 $578.29 $11,378.76 $169.83
 29 ....... 12,071.95 578.29 11,493.66 171.55
May 6 ....... 11,915.55 566.16 11,349.39 169.40
 13 ....... 11,795.25 566.16 11,229.09 167.60
 20 ....... 11,626.75 566.16 11,060.59 165.10
 27 ....... 11,782.25 566.16 11,216.09 167.40
June 3 ....... 10,899.45 500.92 10,398.53 155.25
 10 ....... 11,436.30 500.92 10,935.38 163.20
 17 ....... 11,415.25 500.92 10,914.33 163.20
 24 ....... 11,200.15 500.91 10,699.24 159.70
July 1 ....... 10,768.90 500.91 10,267.99 153.28
 8 ....... 9,647.85 681.96 8,965.89 133.82
 15 ....... 9,882.20 681.95 9,200.25 137.32
 22 ....... 9,406.05 681.95 8,724.10 130.21
 29 ....... 9,382.10 681.95 8,700.15 129.85
 __________ ________ __________
 165,187.05 8,653.61 156,533.44
 5 6 7 8
 Week Actual Weekly Excess Allowance No. of Buses Total
Ending Allowance of Per Bus
 Local Buses
Apr. 22 ....... $180 $10.17 57 $579.69
 29 ....... 180 8.45 57 481.65
May 6 ....... 180 10.60 55 583.00
 13 ....... 180 12.40 55 682.00
 20 ....... 180 14.90 55 819.50
 27 ....... 180 12.60 55 693.00
June 3 ....... 180 24.75 55 1,361.25
 10 ....... 180 16.80 54 907.20
 17 ....... 180 16.80 54 907.20
 24 ....... 180 20.30 52 1,055.60
July 1 ....... 180 26.72 52 1,389.44
 8 ....... 180 46.18 52 2,401.36
 15 ....... 180 42.68 52 2,219.36
 22 ....... 165 34.75 52 1,809.00
 29 ....... 165 35.15 52 1,827.80
 ______ _________
 333.29 17,717.05
 *Page 39 
Column 1 of the above statement shows a broken decline of gross revenue for the buses operating locally from April 22d 1933, to July 29th, 1933. Column 2 shows the actual association expenses of local operation averaged into weeks. Column 4 shows the approximate weekly allowance if all sixty-seven buses were operating on the local line during this period. Column 5 shows the actual weekly allowance for the buses remaining on the local run. Column 6, the difference between column 5 and column 4, shows the excess allowance or additional income to local buses due to the New York operation. The excess income averages approximately $22.22 per week per bus, in which excess the complainants participated. Column 7 shows the number of buses operating on the local line during the mentioned period. Column 8 shows the excess income to local operators for the fifteen-week period.
These figures taken from the books and statements in evidence disprove the allegation that the complainants sustained losses on account of the New York operation. It is also apparent that before the New York operation, and during it, the local income was decreasing, but notwithstanding, the pool allowance was maintained at its former figure. There is evidence that there were seasonal decreases starting at the beginning of the summer months and continuing throughout that season, but the association did not experience that in the year 1933, and it may, with reason, be assumed it did not because of the New York operation. The defendants urge that the financial returns and the profitable effect it had on both local and interstate operations converted former losses into gains.
Papaccio (pages 185, 186 of testimony) and Greenberg (pages 254-256) testifying in behalf of the complainants, stated that the local line was carrying more passengers during the New York run than it had carried before.
Counsel for complainants argued that the rules appended to the original constitution of 1922 governed the association from the time of its formation to the year 1933. Two of the witnesses produced by him on behalf of the complainants so *Page 40 
testified. Drogin (page 8 of testimony) said the old rules were in effect in 1933, but subsequently said (page 59), "anything affecting the operation of the line generally there was a motion made and seconded and the majority would carry over anything pertaining to the line." He testified that expenditures of the association, exclusive of the usual expenses incidental to operation, would be considered by the members and allowed (page 71 of testimony): "If for any reason there were any other expenses incurred by the association a resolution authorizing the incurring of such expenses would be adopted and each individual member would be taxed a proportionate share of the said expenses." This same witness (page 36 of testimony) on direct examination admitted that changes in operations were posted on the bulletin board over the signature of Papaccio, the secretary, which denoted a method of promulgating rules of the association from time to time in conformity with article 16 of the constitution and by-laws (Exhibit C-6) which reads as follows:
"The trustees shall make and publish all rules for operation of the buses and shall notify all the members from time to time of these changes."
Greenberg, testifying for the complainant, said (page 209 of testimony) that "there were statements published and displayed in the office of the association." This same witness in the course of his testimony also said (page 197 of testimony) that "there were no other rules in existence between the adoption of the first and last constitution," except the printed rules contained in Exhibit C-5. He again said (page 237 of the testimony) "it wasn't necessary to change the rules and regulations as they were perfectly satisfactory to the members;" then, again, he said (page 272 of testimony) that he was "always bound by the rules of the majority in the association," and that it was true (pages 272, 273) "that if an expenditure over a hundred dollars was to be made that it could be incurred and paid by a vote of three-fourths of the entire members. The testimony of these witnesses for the complainant support, in part, the position of the defendants. *Page 41 
Posnak, testifying for the complainants, when asked if the old rules were in effect, answered (page 321 of testimony) "yes;" and he later testified (page 338) that he did not know why the old rules as shown in Exhibit C-5 and C-39 were not specifically carried over and appended to the new constitution as shown inExhibit C-6. This testimony presents the inference that the rules were not carried over.
The defendants denied that while the second constitution was in force, the disputed rules were in effect. Gott testified (page 416 of testimony) that "we had no such rules," and (page 437) further said "we had no rules — prior to the adoption of the new constitution" in 1933. Dreyer's testimony (page 466) was to the same effect. He said that the "only rules I know of that controlled our association were the ones made from day to day by the trustees or Mr. Papaccio, our office manager." Dreyer was a trustee of the association from 1930 to 1934 when he became vice-president of the defendant association. He further testified (page 472 of testimony) that the buses were operated since 1930 "in accordance with rules made by the trustees and handed out by Mr. Papaccio" and that these rules were printed in the form of a circular (page 472 of testimony) — weekly notices posted on the bulletin board. It is clear, of course, that article 16 of the constitution (Exhibit C-6) authorizes the trustees to make and change rules. Harford, the president of the association, who was vice-president in 1933, and a trustee in 1930, testifying about the adoption of the constitution in 1930, said (page 479 of testimony) that "there was a split on the line. It laid buses up. Before the members would come back into the line, they wanted a new constitution adopted, the way they wanted the association run, and that was the only way they would tie up together one hundred per cent., and that is how these [the second constitution and by-laws] were adopted. The other constitution and rules, andthe line was discontinued." He further declared (page 482) that "at the time the association broke up [i.e., 1930] our rules and constitution and everything went. * * * The rules were discarded with the rest of it." He testified (page 474) that during the *Page 42 
period the second constitution was in effect "the operation of the buses was controlled by the man in the office who in turn was guided by the constitution." This testimony would indicate that the old rules were discontinued as well as the system of making and publishing the rules and changes therein as directed by article 16 of the second constitution and by-laws. It will be observed that article 16 of the second constitution and by-laws does not appear in the first constitution and rules, which the defendants contend were repealed.
The defendants argue that at the time the constitution was amended in 1930, no action was taken on the rules; and that thereafter, questions of policy became issues to be decided by the association without reference to the old rules; that after the said amendment in 1930, the old rules were ignored in favor of a system of ruling by a majority vote of the members. Nothing appears in the constitution, by-laws, rules, regulations, or customs of the association to prevent or prohibit such a method of governing the actions of the association.
The defendants assert that the complainants acquire, and are entitled to, no rights under the preamble of the constitution since it is not a part thereof. They say the constitution, itself, contains no provision which has been violated; and that the old rules were discarded in favor of the system of regulation by the trustees and members, who made and published the necessary changes from time to time. I believe there is considerable merit in their contention.
The complainants allege in the bill that the municipal consents obtained from Bayonne and Jersey City, and the approval granted by the New Jersey public utility commission, were endangered as a result of New York operations. They offered no evidence to establish that point. On the other hand, the defendants submitted testimony showing that they sent a written communication to the public utility commission informing them of their intent, and their action, to continue their route to New York state. There is nothing in the evidence to show that the utility commission stopped, or attempted to prevent, them from running to New York. *Page 43 
The plan to extend the route to New York was decided upon by the members of the association who by a vote of more than three-fourths of the entire membership approved the plan.
While the quoted preamble of the constitution, among other things, says "we, * * * operators of omnibuses running south on Hudson County Boulevard from Journal Square to Bayonne," such recital did not prevent or have the effect of preventing the buses from running into the city of Bayonne down close to the most southerly point of the city of Bayonne. The complainant members of the defendant association appear to have made no complaint against the buses' invasion in to Bayonne whereas, the preamble's declaration is "to" Bayonne. It indicates just how sacredly certain members of the association regard the limitation of routes when it affects their other vested interests. In the case of Story v. Jersey City, c., Plank Road Co., 16 N.J. Eq. 13,
the court said:
"A change of the route of the plank road by authority of the legislature, at the instance of the plank road company, is not a fundamental change of the objects of the company, or a fundamental alteration of the structure thereof, which equity will restrain at the instance of a stockholder."
It is the policy of this court not to interfere with the actions of voluntary and unincorporated associations where there is no evidence of fraud or oppression. Plemenik v. Prickitt,97 N.J. Eq. 340. The troubles existing between the parties hereto are largely internal. "The courts will not interfere with the internal affairs of an unincorporated association so as to settle disputes between members, or questions of policy, discipline, or internal government, so long as the government of the society is fairly and honestly administered in formity with its laws and the law of the land and no property or civil rights are invaded." 5 Corp. Jur. 1364. There is not the slightest or faintest semblance of evidence in the instant case indicating that there is unfairness and dishonesty administered in the affairs of the defendant association. It is my opinion that no property or civil rights of the parties to these proceedings have been affected, invaded or violated. The defendant corporation is admittedly a voluntary unincorporated *Page 44 
association and as such association the courts "do not exercise visitorial powers over voluntary associations or their proceedings, except to prevent the violation of some law of the state, or to protect or enforce some right already acquired."Mayer v. Journeymen Stonecutters' Association, 47 N.J. Eq. 519.
The testimony throughout the entire case discloses no proof of fraud or oppression and "courts will not interfere with the internal affairs of a voluntary association to settle disputes between local organizations or determine questions of policy, so long as the association is honestly administered in conformity with its laws and the law of the land and there is no fraud or invasion of property or civil right." International Hod CarriersBuilding and Common Laborers' Union of America, Local No. 426, v. International Hod Carriers' Building and Common Laborers'Union of America, Local No. 502, 101 N.J. Eq. 474.
The by-laws of the defendant association were adopted by the members thereof and their reasonableness has not been questioned.
"The courts have no visitorial power to determine whether the by-laws of a voluntary association are reasonable or unreasonable. The only question which it can determine is whether they have been adopted by the rule which has been agreed upon by the members of the association." Green v. Felton,42 Ind. App. 675; 84 N.E. Rep. 166.
On the question of the conduct of a corporation against a competitor it was, among other things, said in the case ofTrimble v. American Sugar Refining Co., 61 N.J. Eq. 340, that the parties in interest in each particular case must decide how far the competition "may be properly carried on without injury to the corporate interests." This case further says:
"Where a corporation is engaged in competition with a rival corporation, and there is nothing to show bad faith or palpably bad judgment on the part of its directors, a court of equity, at the suit of a stockholder, will not enjoin it from selling its products for less than the cost thereof, since it is a question for the corporation, and not for the courts." *Page 45 
In Benedict v. Columbus Construction Co., 49 N.J. Eq. 23,
the court said:
"If stockholders in a corporation disapprove of the company's management, which is conducted without fraud, or by action ultravires, or in gross abuse or trust, or shall consider their speculation a bad one, their remedy is to elect new officers or sell their shares and withdraw. Where the question is one of mere discretion in the management of corporate business by directors, or of doubtful event in the undertaking in which the corporation has embarked, remedy cannot be had by application to a court of equity. Elkins v. Camden and Atlantic Railroad Co., 9 Stew.Eq. 241; Park v. Grant Locomotive Works, 13 Stew. Eq. 114;
affirmed on appeal, 18 Stew. Eq. 244."
The rule is emphasized in Auburn Button Works, Inc., v.Perriman Electrical Co., Inc., 107 N.J. Eq. 554, and Madsen
v. Burns Brothers, 108 N.J. Eq. 275, where the principle enunciated is as follows:
"Authority of directors of corporation in conduct of its business must be regarded as absolute when they act within law; questions of policy of management of corporation are solely for decision of board of directors and court cannot substitute its judgment therefor. 2 Comp. Stat. 1910 p. 1606 ¶ 12."
In Ellerman v. Chicago Junction Railways, c., 49 N.J. Eq. 217,
Vice-Chancellor Green announced:
"Individual stockholders cannot question in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation and in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment.Questions of policy of management, of expediency of contracts oraction, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitation and free from restraint."
The evidence indicates that practically all the members of *Page 46 
the defendant association, with the exception of the complainants, agreed to and approved the acts complained against by the complainants; and such majority of members is persuasive and compels the opinion that the protested acts were in furtherance of the aims and policy of the association. Certainly the acts protested are neither fraudulent, nor oppressive.
The original constitution and rules, as above observed, were adopted in 1922; and, then, in 1930 the association adopted the "constitution and by-laws" referred to above. What is a by-law? It has been defined as a "rule or regulation." 14 Corp. Jur.334 § 426. Counsel for the defendant argues that in view of this definition, a rule may properly be termed a by-law; from which it follows that the association, by the adoption of the constitution and by-laws in 1930, intended thereby to replace the old "constitution and rules" of 1922. The testimony indicates that a majority vote of the members permitted various acts which were inconsistent with the old 1922 rules; and that the association on numerous occasions adopted rules for its government by a majority vote of the members. The complainants admitted this to be a fact.
The evidence (as expressed in the language of one of the witnesses) indicates "the old rules were dropped."
"The general rule in relation to the implied repeal of statutes applies to by-laws of a corporation; and, therefore, a by-law is impliedly repealed by a new by-law which is so inconsistent therewith that both cannot stand, and the adoption by a corporation of a new constitution or by-laws covering the same grounds as the former ones, and intended for the same purpose, impliedly repeals and supersedes the earlier constitution or by-laws, so that penalties imposed by the earlier, or other provisions therein, but omitted from the later, no longer apply. But repeals by implication are not favored, and there is no such repeal where there is no inconsistency and both by-laws may be operative, and no intention to repeal otherwise appears." 14Corp. Jur. 359 § 456.
The acts permitted by the majority membership rule were inconsistent with the former rules of the association as *Page 47 
expressed in the first constitution and rules. The old original rules and the rules subsequently passed by the majority, were inconsistent and both could not be operated together. It is to be observed that the rules or by-laws themselves made no provision for their alteration or amendment; and, they, therefore, were subject to be altered, amended, or repealed, at any meeting of the members, by a majority vote of those present. The 1922 constitution contained a provision for the amendment thereof, but the rules which were adopted following the approval of that constitution, contained no provision for amendment. In Taboada
v. Sociedad Espanola, c., 191 Cal. 187; 215 Pac. Rep. 673;27 A.L.R. 1508, it was there said:
"A provision of a constitution of a secret society prescribing the method of amending the constitution and statutes has no application to an amendment of the by-laws."
An examination of the old rules (C-4) shows that additions and changes were contemplated; that reference is to be found in "rule 33," reading as follows:
"Rule 33. Any addition or change to the above rules shall be strictly adhered to by the members."
Then in 14 Corp. Jur. 359 ¶ 456, is the following rule:
"If the by-laws make no provision for their alteration or amendment they may be altered, amended, or repealed, at any meeting of the stockholders where there is a quorum by a majority vote of those present."
In Supreme Lodge, Knights of Pythias, v. Kutscher, 179 Ill. 340; 70 Am. Sr. and Supreme Lodge, Knights of Pythias, v.Knight, 117 Ind. 489; 3 L.R.A. 409, the following appears:
"A constitution of a voluntary association or a corporation is nothing more than a by-law under an inappropriate name. The power that can enact a by-law, whether called a constitution or not, can alter or abrogate it, unless some higher rule restrains or prohibits a change or repeal."
In Bachman v. Harrington, 102 N.Y. Supp. 406; 52 Mis. Rep.26, the court said:
"By the adoption of a new constitution and by-laws covering *Page 48 
the same grounds as former ones, and intended as a substitute for the same, the earlier constitution and by-laws are thereby repealed, and the penalties imposed by them fall where they areomitted from the new constitution."
The complainants assert the constitution is a contract between the members and binding upon them. That assertion cannot be successfully assailed; but I have failed to discover where the constitution of the association has been violated by the defendants, and where the acts of the association or its members were ultra vires. Not the slightest bit of testimony shows what part of the constitution, or rules, was violated by the defendants. The bill of complainant, likewise, is silent on what part of the constitution or rules was violated. The members of the defendant association offered and passed a resolution providing for the operation of buses of the association over the regular route and to continue thereafter over an extended route to New York City. The presentation and adoption of this resolution does not appear to have been prohibited by any word, or provision, in the constitution, rules, or by-laws of the defendant association. True, the preamble recites "we * * * the operators of omnibuses running south on Hudson County Boulevard from Journal Square to Bayonne" (Exhibit C-6), and mentions a route, still the preamble is not a part of the constitution, or the rules, or the by-laws; and it cannot enlarge or enforce any powers, nor control the words of the constitution unless the constitution itself is doubtful or ambiguous. In my opinion, the constitution is neither doubtful nor ambiguous; its contents are clear and decisive. A preamble to a constitution bears the same relation as a recital does to a contract. In Noice v. Schnell,101 N.J. Eq. 252, the court, among other things, said:
"A preamble is an introductory or explanatory statement. Apreamble is not conisdered a part of the law, a resolution, or adocument. It is an aid, it is true, in interpreting an ambiguity, if an ambiguity exists. It is resorted to to dispel an ambiguity, but is not used for the purpose of creating a doubt or uncertainty which otherwise would not exist." Den, *Page 49 ex dem. James v. DuBois, 16 N.J. Law 285 (at p. 294); see13 C.J. 538 ¶ 14; Bellisfield v. Holcombe, 102 N.J. Eq. 20;Enderlich on Interpretation of Statutes, 62; Torrance v.McDougald, 12 Ga. 526; Trower v. Elder, 77 Ill. 452; Price v.Bigham's Ex'rs, 7 Harr. J. (Md.) 296; Ming v. Woolfolk,3 Mont. 380; Kehoe v. Blethen, 10 Nev. 445; Baxter v. State,9 Wis. 38.
An examination of the constitution and by-laws of the association, exclusive of the preamble, shows no route, nor contemplated route; that being so, I cannot see how the preamble can be looked to, to supply a deficiency where none appears to exist. It cannot be successfully maintained that the preamble to the constitution of the United States in any way controls its operation. Corp. Jur. 693.
That a preamble of a statute or a constitution is no part thereof has been frequently announced by the courts. The following is indicative of the rule:
"Preamble: An introduction prefixed to a statute, reciting the intentions of the legislature in framing it, or the evils which led to its enactment. It is no part of the law." Bouvier's LawDictionary.
 United States v. Oregon and California Railroad Co.,164 U.S. 526: "To render the title of an act of any avail in its construction, the language of the act must be doubtful or ambiguous and the ambiguity must be in the context, and not in the title."
Yazoo, c., Railroad Co. v. Thomas, 132 U.S. 174. In this case, an attempt was made to use the preamble in question as part of the statute, or at least as having a great influence on its construction. The court (at p. 308), declared:
"Again, the preamble to the act is referred to by counsel as sustaining their construction, because it is therein declared that the work is one of `great public importance,' and `to be encouraged by legislative sanction and liberality,' and that `the physical difficulties of constructing and maintaining railroads to, across, along or within either the Mississippi, Sunflower, Deer Creek or Yazoo bottoms or basins, or the other alluvial lands herein referred to, are such that no private *Page 50 
company has so far been able to establish a railroad and branches developing said basins and alluvial lands, and connecting them with the railroad system of the country.' But as the preamble isno part of the act, and cannot enlarge or confer powers, norcontrol the words of the act, unless they are doubtful orambiguous, the necessity of resorting to it to assist inascertaining the true intent and meaning of the legislature is
in itself fatal to the claim set up."
This case was cited and followed in the following cases:United States v. Oregon and California Railroad Co., supra;United States v. McCrory, 119 Fed. Rep. 861; 56 C.C.A. 376;State v. Ohio Oil Co., 150 Ind. 21; 49 N.E. Rep. 809;47 L.R.A. 633; Lackland v. Walker, 151 Mo. 210; 52 S.W. Rep. 414; State,ex rel. Leidigh v. Holcomb, 46 Neb. 625; 65 N.W. Rep. 873.
In the case of Jacobson v. Massachusetts, 197 U.S. 11,
discussing the fact of the preamble to the constitution, the court (at p. 648) remarks:
"We pass without extended discussion the suggestion that the particular section of the statute of Massachusetts now in question (section 137, chapter 75) is in derogation of rights secured by the preamble of the constitution of the United States. Although that preamble indicates the general purposes for which the people ordained and established the constitution, it has never been regarded as the source of any substantive power conferred on the government of the United States or on any of its departments. Such powers embrace only those expressly granted in the body of the constitution, and such as may be implied from those so granted. Although, therefore, one of the declared objects of the constitution was to secure the blessings of liberty to all under the sovereign jurisdiction and authority of the United States, no power can be exerted to that end by the United States, unless apart from the preamble, it be found in some expressed delegation of power, or in some power to be properly implied therefrom 1 Story Con. § 462."
 25 R.C.L. 25, under the title "Statutes," considering the term "preamble," states: *Page 51 
"As sometimes expressed, it is the key to open the mind of the makers of the law. The preamble is, however, not an essential part of the act, and cannot enlarge or confer powers, nor control the words of the act unless they are doubtful or ambiguous. Hence it has been held that the necessity of resorting to it in order to ascertain the true intent and meaning of the legislature is fatal to any claim which by ordinary rules of interpretation can be sustained only by clear and unambiguous language."
In the old case of Den, ex dem. Lloyd v. Urison,2 N.J. Law 197 (at p. 212), the court discusses the problem of having a preamble to a statute restrain or enlarge the fact of the enacting clauses. As stated (at p. 212):
"It is evident that the legislature meant to change this rule, so far as it respected the exclusion of the half-blood, and to lay down a new one; in doing of it they have made it general, and under the best view I have been able to give the subject, I cannot think this court authorized to narrow or restrain it; nor that the words of the enacting clause being clear, explicit, and unambiguous, laying down with simplicity and perspicuity, a new rule of canon of descent, can be restrained or limited by reason of the language of the preamble not expressing an intent co-extensive with the words of the enacting clause, but not repugnant to them."
See, also, the case of Den, ex dem. James v. Dubois, supra:
"When a statute is in itself ambiguous and difficult of interpretation, the preamble may be resorted to, but not to create a doubt and uncertainty, which otherwise does not exist."
In the case of Brown v. Erie Railroad (Court of Errors andAppeals), 87 N.J. Law 487 (at p. 491), again the question of preamble and its effect arose. The court declared:
"It appears to me to be a settled principle of law, that the preamble cannot control the enacting part of the statute, in cases where the enacting part is expressed in clear, unambiguous terms; but in case any doubt arises on the enacting part, the preamble may be resorted to, to explain it, and show the intention of the lawmaker. The enacting part of this *Page 52 
statute is clear and explicit; there is no ambiguity on the face of it. Shall we then go out of the enacting part, which is clear and intelligible, and resort to the preamble, to create an ambiguity, and then have recourse to the same preamble, to explain this ambiguity? It appears to me, that this would be carrying the office of the preamble beyond anything heretofore contemplated, by giving it a paramount authority to the enacting part of the statute itself.
"It is well settled that where the intention of the legislature is clearly expressed in the purview or body of the act the preamble shall not restrain it, although it be of much narrower import. Sedgw. Stat. Const. L. 43."
It is never considered as an integral part of the constitution unless it be used to clear up an ambiguity in the constitution, itself, and a careful perusal of the constitution discloses no such ambiguity. That being so, the members of the association are not bound by any well-defined route and their adoption of the proposition to run buses to New York was, therefore, not ultravires, since it was not in violation of any part of the constitution and it did not transcend their authority.
Nothing appears in the testimony to show that the constitution, the rules, the by-laws or regulations of the association forbids the government of the association by a majority vote of its members. Subsequent to the adoption of the 1930 constitution, the old, or former, rules were ignored, and the association, from then on, was governed by rules or resolutions adopted from time to time by a majority vote of the members. The trustees of the organization were by majority vote empowered to manage the association and to promulgate the changes and modifications made in the rules from time to time.
"In the absence of anything to the contrary in the laws or usages of the association, the majority of the members possess authority to control its action as to all matters within the scope of the objects for which it was formed, whether such objects are mentioned in the articles of association or are necessarily implied therefrom; and this includes the power of control over the funds of the association." 5 Corp. Jur. 1361 ¶90. *Page 53 
In Gifford v. New Jersey Railroad and Transportation Co.,10 N.J. Eq. 171, the court, among other things, said (at p. 174), "that acting within the scope and in obedience to the provisions of the constitution of the corporation, the will of themajority, duly expressed at a legally constituted assembly, must govern." We find an exposition of this principle laid down in25 R.C.L. 30 ¶ 7:
"Members are bound by amendments and additions to the constitution or by-laws subsequently adopted in accordance with existing rules, even though they vote against the changes so made; and though the change increases the payments to be made by them, or otherwise injuriously affects them."
Again in Kozusko v. Garretson, 102 N.J. Law 508, the court said:
"It may well be conceded that when in a parliamentary body a majority vote suffices for effective enactment, and some vote aye and the others remain silent, they are taken as voting in the affirmative. Such we understand to be the law. In line with thisis the principle that where a quorum is present, a proposition iscarried by a majority of all the votes cast, though some of themembers present refuse to vote. 29 Cyc. 1690. This is, or was, the congressional rule. United States v. Ballin, 144 U.S. 1;12 S.Ct. 507; 36 L.Ed. 321."
The complainants allege that the moneys of the association used in connection with the New York run were in effect improvidently expended. I am satisfied that allegation is not so; I believe the moneys were expended for purposes wholly within the general scheme of operation. The funds were not used to exploit any new and distinct enterprise. They were spent for the furtherance of an extended line of business. The extension was not a business that was foreign to the regular plan of the association. There was no change in its character. It was a business of transportation by omnibus. There was no evidence to show that the association, or its trustees, or its members, diverted the funds of the association outside of its legitimate business. In Story
v. Jersey City, c., supra, the court said: *Page 54 
"There are a number of cases in which the court have enjoined a corporation having funds for distinct objects, from using them to promote an application to parliament for a fundamental change in their charter. But this, it is obvious, is an exercise of power resting on very different principles. It is simply a restraint upon the corporation of a diversion of its funds from the purposes for which they are held in trust to other and different purposes. The Attorney-General v. The Corporation of Norwich,16 Simons 225; Munt v. The Shrewsbury and Chester Railway Co.,13 Beav. 1; Stevens v. The South Devon Railway Co., Ibid. 48;The Great Western Railway Co. v. Ruthout, 5 D.G. S. 290; 10Eng. L. Eq. 72; Simpson v. Denison, 10 Hare 51; 16 Jur.828."
In extending the route from the boulevard to New York, the defendants did not alter the general object for which the association was formed; the extension did not constitute a distinctly different business. Story v. Jersey City, c.,supra.
The witnesses produced by the complainants appear to be directly or indirectly connected with and financially interested in competing companies. It is my opinion that the suit of the complainants was brought not because the extension was fraught with financial disaster, as alleged by them, because of the invasion of their property rights, or because of its anticipated financial loss to the defendant association, or its members, as it was to curb, or prevent, a successful and profitable operation by the association which impaired, or seriously affected, the income of the Boulevard Transit Lines, Incorporated, the competitor aforesaid. The allegations of losses contained in the bill were not sustained by the proofs. On the contrary, the complainants interested in the defendant association, shared in fairly high pool allowances resulting from the New York operation of the defendant association. Where there is a loss from one side of an operation and a gain in another part, it does not justify the court in interfering by forcing its judgment as a substitute for the opinion of the members guiding the affairs of the association. Trimble v. American Sugar Refining Co., supra. I question the sincerity *Page 55 
of the motives of the complainants. Prindiville v. Johnson Higgins, 93 N.J. Eq. 425; American Plaster Drill Co. v.Francisco, 108 N.J. Eq. 323.
Nearly all of the witnesses for the complainant were somewhat hesitant, lacked knowledge of minor details of transactions which purported to sustain their case, and lacked recollection as to general facts surrounding dealings in which they were engaged. Their attitude suggested the inference that they were hiding facts which should have been presented to the court. I do not believe the complainants have sustained injury. In my opinion, the evidence precludes a reasonable probability of injury in the future. It is hardly necessary to state that in innumerable decisions in this state the complainants' right in the subject-matter in dispute, and for the remedy sought must be clear to the court and free from reasonable doubts. Delaware andRaritan Canal, c., Cos. v. Camden and Amboy Railroad Co.
(Chancery, 1863), 16 N.J. Eq. 321; affirmed, Raritan andDelaware Bay Railroad Co. v. Delaware and Raritan Canal, c.,Cos., 18 N.J. Eq. 546; Black v. Delaware and Raritan Canal Co.
(Chancery, 1871), 22 N.J. Eq. 130; reversed, 24 N.J. Eq. 455;Brown v. Folwell, 7 N.J. Eq. 593; Morris Canal and Banking Co.
v. Central Railroad Co., 16 N.J. Eq. 419; Morris Canal andBanking Co. v. Mattheison, Ibid. 443; Erie Railway Co. v.Delaware, Lackawanna and Western Railroad Co., 21 N.J. Eq. 283;Hackensack Improvement Commission v. New Jersey Midland RailwayCo., 22 N.J. Eq. 94; Morris Canal and Banking Co. v. Fagin
(1905), Ibid. 430; Sperry Hutchinson Co. v. Hertzberg,69 N.J. Eq. 264.
In Marvel v. Jonah, 81 N.J. Eq. 369, the principle is laid down that an injunction should not issue in a case such as the instant one, where the benefit to the complainant is slight in comparison with the injury to the defendants.
For the reasons herein expressed, I feel that the restraint heretofore issued should be dissolved and the bill of complaint filed herein should be dismissed, and I shall advise an order to this effect. *Page 56